In the Matter of FLAGSTAFF FOOD-
SERVICE CORPORATION, et
al., Debtors.

McCAIN FOODS, INC., Plaintiff,

v.

FLAGSTAFF FOODSERVICE COMPA-
NY NEW ENGLAND, INC.,
Defendant.

Bankruptcy Nos. 81–B–11430 to
No. 81–B–11436.
Adv. No. 81–5485.

United States Bankruptcy Court,
S. D. New York.

Oct. 5, 1981.

Levin & Weintraub, New York City, for debtor; Elias Mann, New York City, of counsel.

Dahan, Appel & Nowick, New York City, for McCain Foods, Inc.; Edward R. Curtin, New York City, of counsel.

Angel & Frankel, New York City, for the Creditors Committee; Joshua J. Angel, New York City, of counsel.

## OPINION

ROY BABITT, Bankruptcy Judge:

This dispute between Flagstaff Foodservice Company New England, Inc. (Flagstaff or debtor), a Chapter 11 debtor and McCain Foods, Inc. (McCain) centers on the reach of Section 546(c) of the 1978 Bankruptcy Code, 11 U.S.C. (1976 ed. Supp. III) § 546(c), involving the rights Congress gave in that section to a seller of goods on credit to an insolvent purchaser.

Flagstaff, a distributor of food to institutional customers, filed its petition in this court on July 21, 1981 for the relief afforded by Chapter 11 of the 1978 Code. Sections 109(d) and 1101 *et seq.*[1] Upon learning of this filing, McCain, a seller on credit of $11,610. worth of frozen french fried potatoes, made a timely demand to reclaim these foodstuffs in accordance with Section 2–702(2) of New York's Uniform Commercial Code (U.C.C.). As this demand proved fruitless, McCain sought judicial aid in recovering the property sold to Flagstaff. McCain began an adversary proceeding under Rule 701(1) of Part VII of the Bankruptcy Rules, 411 U.S. 1068.[2]

---

1. The numbering of sections of the Code, Pub.L. 95–598, 92 Stat. 2549–2657, U.S.Code Cong. & Admin.News 1978, p. 5787, remains the same for their appearance in Title 11, United States Code. Section 101.

2. The Part VII Rules governing the procedural mode for the kinds of actions described in Rule 701 were applicable in Chapter XI cases under the 1898 Act, repealed since October 1, 1979, by the force of Rule 11–61, 415 U.S. 1037. As such rules are procedural in accordance with

McCain filed a complaint seeking reclamation, Rule 703, and alleged the sale on credit, the delivery of the potatoes, the debtor's insolvency, the filing of Flagstaff's Chapter 11 petition, the demand required by Section 2–702(2) of the U.C.C. and by Section 546(c)(1) of the Code, and the timeliness of the demand as prescribed by both of these sections.

Although Flagstaff's answer facially put some of these allegations in issue, its main defense was bottomed on the premise that McCain could reclaim only those potatoes in the debtor's possession and that, in any event, McCain could not receive payment for the value of such goods but would have to settle for priority status as an administrative expense creditor.[3]

At the hearing, both sides agreed that there were no controlling facts in dispute save for the quantity of the potatoes from the specific sale still in the debtor's possession when the petition was filed,[4] and as to that the parties could readily ascertain the quantity without the need for testimony. (pp. 22, 29 of the August 13, 1981 transcript).

Putting aside for a moment the position of the creditors' committee formed under Section 1102 to be read in this United States Trustee District with Section 151102,[5] McCain insists that it is entitled to an administrative claim under Section 546(c)(2)(A) for the full amount of its $11,610 shipment or a lien to that extent under Section 546(c)(2)(B), both without regard to whether any or all of the shipped foodstuffs

could be retrieved by reclamation. The debtor insists that the discretion conferred by those sections may be exercised only to the extent it holds property which McCain could reclaim under applicable teachings.

For the reasons which follow the court concludes that the reading given to Section 546(c) of the 1978 Bankruptcy Code by the debtor is the proper one and that the plaintiff, McCain, is entitled to the administrative claim priority given by the scheme of the Code, but only to the extent of that portion of the foodstuffs delivered on July 13, 1981 which was in the debtor's possession on the date of McCain's demand.[6]

## I.

### A SELLER'S PRE–1978 BANKRUPTCY CODE RIGHTS

Section 546(c) of the Code knows no antecedents in bankruptcy statutes as it appears to be Congress' first expression in the area it touches. But it cannot be said that Congress was unaware of non-federal statutes on the subject of the rights of sellers to recover property sold to insolvent purchasers and of the interfacing of those statutes with Congress' bankruptcy enactments as taught by federal judges. As so much is clear from the words of Section 546(c) itself and from its legislative history, the court does more than just assume that Congress knew of the state of the law before it wrote as it did. Compare *Erlenbaugh v. United States*, 409 U.S. 239, 243–4, 93 S.Ct. 477, 480, 34 L.Ed.2d 446 (1972). See S.Rep. No. 95–989, 95th Cong., 2d Sess. 86–7 (1978);

their source found in 28 U.S.C. § 2075, they apply in cases filed under the 1978 Code for they are not inconsistent with what Congress wrote there. See 28 U.S.C. § 2075 as amended by Section 405(d) of Title IV of the 1978 statute, 92 Stat. 2685. And none of the Suggested Interim Bankruptcy Rules drafted by the Advisory Committee on Bankruptcy Rules of the Judicial Conference of the United States has superseded the Part VII Rules.

**3.** Section 503 of the Code prescribes those claims, usually arising after a bankruptcy petition has been filed, which are given administrative expense status. As such, first priority is accorded in the Code's scheme of priorities spelled out by Section 507(a). Section

726(a)(1) then provides for the distribution of the estate's property first to the Section 507 priorities "in the order specified" in that section.

**4.** The reclamation demand and the filing of the Chapter 11 petition occurred on the same day. (p. 18 of the August 13, 1981 transcript).

**5.** The Southern District of New York is a United States Trustee pilot district pursuant to Section 1501, the first of the sections in Chapter 15 of the Code entitled United States Trustees.

**6.** July 21, 1981, also the date of the Chapter 11 petition. See fn. 4, *supra*.

H.Rep. No. 95–595, 95th Cong., 1st Sess. 371–2 (1977).[7]

Section 546(c) reads this way:

"The rights and powers of the trustee under sections 544(a), 545, 547 and 549 of this title are subject to any statutory right or common-law right of a seller, in the ordinary course of such seller's business, of goods to the debtor to reclaim such goods if the debtor has received such goods while insolvent, but—(1) such a seller may not reclaim any such goods unless such seller demands in writing reclamation of such goods before ten days after receipt of such goods by the debtor; and (2) the court may deny reclamation to a seller with such a right of reclamation that has made such a demand only if court—(A) grants the claim of such a seller priority as an administrative expense; or (B) secures such claim by a lien."

As the section clearly recognizes a common law or nonbankruptcy statutory right of a seller to reclaim goods received by an insolvent, it is not inappropriate to consider what those rights were first at common law and, later, by statute. See Frankfurter, *Some Reflections on the Reading of Statutes*, 47 Colum.L.Rev. No. 4 at 537 (1947).

### A. AT COMMON LAW

At common law, the right of a seller to reclaim his goods was governed by the law of contracts which permitted rescission by a seller who was induced to enter into a sales contract by a fraudulent or innocent misrepresentation. There were essentially four kinds of conduct which gave a seller at common law the right to rescind a sale based on the buyer's insolvency: (1) the buyer's concealment of insolvency with a demonstrable intent not to pay for the goods; (2) the buyer's concealment of insolvency where intent not to pay cannot be demonstrated; (3) the buyer's insolvency did not have to be proved but the buyer had materially misrepresented his financial status; and (4) the buyer's innocent misrepresentation. But, see 4A *Collier on Bankruptcy* (14th ed.) ¶ 70.41 for the treatment of this fourth common law basis for rescission on the coming of bankruptcy.

But the reach of the remedies flowing from rescission from the standpoint of the seller's ability to retrieve the property sold on application of common law principles yielded a melange of state court rulings. These turned on identification of the goods, their fungibility, commingling and the like where reclamation was not possible under applicable law because of problems of identification, the tracing of funds specifically allocable to the seller's goods yielded some solace in some places.

The lack of consistent and predictable handling of the dialogue between a seller and an insolvent purchaser and the absence of a standard which could harmonize the interests of both in an expanding economy has been noted, *inter alia*, in Weintraub & Edelman, *Seller's Right to Reclaim Property Under Section 20702(2) of the Code Under the Bankruptcy Act: Fact or Fancy*, 32 Bus.Law 1165, 1167 (1977).

### B. UNDER SECTION 2–702(2) OF THE UNIFORM COMMERCIAL CODE

In large measure, the Uniform Commercial Code, and particularly relevant in this dispute, Section 2–702(2), were designed to afford certainty and completeness in preference to "those sources of 'general law' to which we were accustomed to resort in the days of *Swift v. Tyson*", to borrow the words of Judge Learned Hand in *New York, N.H. & H.R. Co. v. Reconstruction Finance Corp.*, 180 F.2d 241, 244 (2d Cir. 1950). Today, 15 years after Judge Friend-

---

**7.** These legislative statements refer to Section 546(b) which carried the content of enacted Section 546(c) in bills introduced earlier than the version of H.R. 8200 introduced on September 28, 1978 and enacted with some Senate changes of October 6. Those earlier bills were versions of H.R. 8200 and of S. 2266. For the text of H.R. 8200 introduced on September 28, 1978, see 124 Cong.Rec.H. 11047 *et seq.* (daily ed. Sept. 28, 1978). For acknowledgment that enacted Section 546(c) was the same in its scope as earlier unenacted Section 546(b), see 124 Cong.Rec. H.11097 (daily ed. Sept. 28, 1978) on the House side and, in the same volume, on the Senate side, S.17414 (daily ed. October 6, 1978).

ly made the observation in *United States v. Wegematic Corp.*, 360 F.2d 674, 676 (2d Cir. 1966), the Uniform Commercial Code is with us as "a truly national law of commerce".

Section 2–702(2) of the U.C.C. is as follows:

"(2) Where the seller discovers that the buyer has received goods on credit while insolvent he may reclaim the goods upon demand made within ten days after the receipt, but if misrepresentation of solvency has been made to the particular seller in writing within three months before delivery the ten day limitation does not apply. Except as provided in this subsection the seller may not base a right to reclaim goods on the buyer's fraudulent or innocent misrepresentation of solvency or of intent to pay".

As the Official Uniform Comment discloses, Section 2–702(2)

"takes as its base line the proposition that any receipt of goods on credit by an insolvent buyer amounts to a tacit business misrepresentation of solvency and therefore is fraudulent as against the particular seller. This Article makes discovery of the buyer's insolvency and demand within a ten day period a condition of the right to reclaim goods on this ground. The ten day limitation period operates from the time of receipt of the goods. An exception to this time limitation is made when a written misrepresentation of solvency has been made to the particular seller within three months prior to the delivery. To fall within the exception the statement of solvency must be in writing, addressed to the particular seller and dated within three months of the delivery".

And as to the goods involved in the seller's Section 2–702(2) quest, the rights there given bar all other remedies.

What emerges plainly from the section is that its predicate is the existence of the goods in the seller's possession and therefore able to be reclaimed. These must not have left the seller's possession as is clear from Section 2–702(3) making the rights of the seller seeking to recover subject to the rights of the purchasers there described.

Given the limitations on the seller's right to recover the goods and the problems inherent in tracing specific fungibles among others from the standpoints of the time of delivery of a given lot, it came as no surprise that the proceeds of a seller's identifiable goods would become the object of a seller's Section 2–702(2) claim. See 4A *Collier on Bankruptcy* (14th ed.) ¶ 70.39. That such a remedy going beyond Section 2–702(2) would cause problems is nowhere made more clear than in the several opinions coming from the Fifth Circuit Court of Appeals in *Matter of Samuels & Co., Inc.* There, after an earlier reversal and remand on other grounds by the Supreme Court, *sub nom. Mahon v. Stowers*, 416 U.S. 100, 94 S.Ct. 1626, 40 L.Ed.2d 79 (1974), the Court of Appeals divided in a dispute between a trustee in bankruptcy and a seller of cattle seeking to reclaim that which he could not get as the cattle had been slaughtered and butchered or, alternatively, seeking the proceeds attributable to the sale of the meat. 510 F.2d 139 (1975). Although the presence of a secured creditor loomed large, the majority opinion recognized that the cash seller's right to reclaim should not rest on the identity of the cattle as sold. 510 F.2d at 148. In short, reclamation on the facts there, was found to be "a futile gesture" contrary to "reason or logic". *Ibid.* Circuit Judge Godbold dissented, 510 F.2d at 154. Among other chidings, Judge Godbold took Section 2–702 of the Texas version of the U.C.C. to confer a right to reclaim and not a "right to go after proceeds". 510 F.2d at 157. Rehearing *en banc* was granted and the Court of Appeals, dividing 9–5, reversed the panel decision and adopted "as its opinion the dissenting opinion of Judge Godbold ...". 526 F.2d 1238, 1240 (1976), *reh. den.* April 1, 1976, *cert. denied sub. nom. Stowers v. Mahon*, 429 U.S. 834, 97 S.Ct. 98, 50 L.Ed.2d 99 (1976).

It would seem to follow, therefore, just from the tenor of the disparate views in the *Samuels* case itself and in others which need not be cited that the remedy of recla-

mation to a seller bringing himself within the plain language of U.C.C. Section 2–702(2) is secure as to the identifiable goods in the possession of the purchaser but much less so as to the proceeds yielded by the sale of those goods, for the tracing of specific funds attributable to specific sales is a formidable obstacle at best.

### C. BANKRUPTCY UNDER THE 1898 ACT AND ITS IMPACT ON U.C.C. SECTION 2–702(2)

While the cup of the Section 2–702(2) seller was apparently full given the strictures of the section as to the goods sold and the questionable right to recover proceeds if they could be properly traced, a line of cases emerged where the purchaser's bankruptcy intervened which brought the seller's cup to overflowing.

*In re Good Deal Supermarkets*, 384 F.Supp. 887 (D.C.N.J.1974); *In re Giltex*, 17 U.C.C.Rep. 887 (D.C.S.D.N.Y.1975), and *In re Weston's Corp.*, 17 U.C.C.Rep. 423 (Bkptcy Ct.S.D.N.Y.1975) all held for one reason or another that the right given by U.C.C. Section 2–702 collided impermissibly with rights given trustees in bankruptcy to denounce disguised priorities which looked like liens under state law. See Section 67(c)(1)(A) of the Act, 11 U.S.C. (1976 ed.) § 107(c)(1)(A). Other courts however, sustained the vitality of Section 2–702(2) as against trustees in bankruptcy although they reached these results by different lines of reasoning. Compare *In re Telemart*, 524 F.2d 761 (9th Cir. 1975), *cert. denied* 424 U.S. 969, 96 S.Ct. 1466, 47 L.Ed.2d 736 (1976), and *In re Daylin, Inc.*, 596 F.2d 853 (9th Cir. 1979), with *In re Federals*, 553 F.2d 509 (6th Cir. 1977), with *In re Mel Golde Shoes, Inc.*, 403 F.2d 658 (6th Cir. 1968). See also *In re Jaylaw Drug, Inc.*, 2 B.C.D. 867 (Bkptcy Ct. S.D.N.Y.1976) where the seller sought and found refuge in his common law right to rescind on the purchaser's bankruptcy, thereby eschewing U.C.C. Section 2–702(2).

### II.

### A SELLER'S RIGHTS UNDER SECTION 546(c) OF THE 1978 BANKRUPTCY CODE

It is against this setting that Congress expressed itself in Section 546(c) of the Code in the matter of a seller's right to reclaim its goods where the purchaser had become subject to the provisions of the Bankruptcy Code.

What emerges plainly from the rather sparse legislative comments to Section 546 is that Congress was aware of the tension between U.C.C. Section 2–702 and the several rights given bankruptcy trustees by the 1898 Act to denounce certain pre-petition transactions. Swiftly and surely, Section 546(c) in its lead-in sentence resolves the disparate views of federal courts concerning the effect of bankruptcy on a reclaiming seller's U.C.C. or common law rights. Whatever weapons a bankruptcy trustee might have in his arsenal to gather the estate are subject to the U.C.C. statutory right or common law right of a seller to retrieve his goods.[8]

Congress explained this purpose of enacted Section 546(c) this way:

"The purpose of the provision is to recognize, in part, the validity of section 2–702 of the Uniform Commercial Code, which has generated much litigation, confusion, and divergent decisions in different circuits.

S.Rep. No. 95–989, 95th Cong., 2d Sess. 86–7 (1978); H.Rep. No. 95–595, 95th Cong., 1st Sess. 371–2 (1977), U.S.Code Cong. & Admin.News 1978, pp. 5872–5873, 6328.

It is not necessary in the context of the specific dispute here to appraise Section 546(c) against Section 2–702(2) to determine whether a seller's right to seek reclamation depends on different conditions precedent where bankruptcy has come. See *In re*

---

**8.** The rights of the trustee given by bankruptcy law which are specifically defined to be subordinate to a reclaiming creditor's rights are those conferred by Section 544 of the Code—the trustee as lien creditor (the strong-arm power); by Section 545—avoidance of statutory liens; by Section 547—avoidance of preferential transfers; and by Section 549—avoidance of post-petition transfers.

*Auto Parts Distributors, Inc.,* 9 B.R. 469, 7 B.C.D. 490 (Bkrtcy.S.D.N.Y.1981).

Here the issue is whether, if reclamation is denied, and the court exercises its judgment to grant the seller a priority administrative claim or a lien, both authorized by Section 546(c)(2), the extent of either will exceed the value of the property which could be retrieved so that the full value of the goods sold will fix the reach of the priority or the lien.

Insofar as the discretion conferred on the court by Section 546(c)(2) expands the careful priority scheme outlined by Congress in Section 507(a) in which administrative claims under Section 503(b) lead all the rest, a legislative purpose to achieve greater expansion should be plainly expressed.

The conclusion emerging plainly is that the legislative history falls far short of what would be needed for the definitive answer that Section 546(c)(2) intended to give more to a reclaiming seller than he ever had either at common law or under U.C.C. Section 2–702(2). See *Maine v. Thiboutot,* 448 U.S. 1, 7, 100 S.Ct. 2502, 2505, 65 L.Ed.2d 555 (1980). To the contrary, the identical statements by Congressman Edwards, the House sponsor of H.R. 8200, and by Senator DeConcini, on the Senate side, support this court's conclusion that the administrative claim or lien which could be granted are in lieu of the goods which the seller could retrieve and not in lieu of the total invoiced shipment. Both legislators saw Section 546(c)(2) as permitting the bankruptcy court to grant an administrative expense claim or a lien

"in lieu of turning over the property" 124 Cong.Rec.H. 11097 (daily ed. September 28, 1978); 124 Cong.Rec.S. 17414 (daily ed. October 6, 1978).

"These remarks, offered in lieu of a conference report by the principal sponsors of the Act, are entitled to great weight".

*In re Spong; Pauley v. Spong,* 661 F.2d 6 at 10 (2d Cir. 1981).

To be sure, the identical comments by both the House and the Senate relevant to an earlier version of enacted Section 546(c)(2) [9] are ambiguous and could support plaintiff's argument were it not for the much surer comments made on the eve of passage of a revised bill, H.R. 8200, introduced on September 28, 1978. Both statements, which recognize the right given by U.C.C. Section 2–702, observe that that right (to reclaim) is subject to the court's power to grant an administrative expense priority in lieu of reclamation

"for his [the seller's] claim arising out of the sale of the goods".

S.Rep. No. 95–989, *supra,* at 87; H.Rep. No. 95–595, *supra,* at 372, U.S.Code Cong. & Admin.News 1978, pp. 5878, 6328.

At first blush, these quoted words suggest that a seller could be given his priority for the invoiced amount rather than for the value of the goods which he could actually recover. But this reading of these few words would require the court to ignore their context and to put at nought strong policy considerations which underlie bankruptcy principles.

The context of which the above statement is a part recognizes the continuing vitality of U.C.C. Section 2–702 or common law rights given reclaiming sellers. All Section 546(c)(1) does is assess a somewhat different procedural mode by requiring a written demand for reclamation within 10 days of the receipt of the goods by the debtor in a bankruptcy proceeding. There is absolutely nothing to show that Congress meant to expand rights given, absent bankruptcy, by state law or the common law. The plain language of all the legislative comments makes this clear.

All this aside, bankruptcy is governed by its own truths and those truths relevant here also require the court to construe Section 546(c)(2) in favor of the debtor and the overwhelming mass of the debtor's unsecured creditors for whom neither U.C.C.

---

**9.** Section 546(b) in unenacted H.R. 8200, 95th Cong., 2d Sess. (February, 1978) and in unenacted S.2266, 95th Cong., 2d Sess. (July, 1978). Neither of these bills offered a lien in lieu of an administrative expense claim.

Section 2–702, the common law, nor Section 546(c) works.

First it must be recognized that Congress' scheme of priority creditors, while designed to achieve important policy aims thought relevant, nevertheless distorts one of the dominant schemes of bankruptcy—equality of distribution. See, *inter alia, Nathanson v. N.L.R.B.*, 344 U.S. 25, 29, 73 S.Ct. 80, 83, 97 L.Ed. 23 (1952). It follows, therefore, that if Congress meant to give the 10-day seller so much more than he ever had under non-bankruptcy law to the exclusion and detriment of the 11-day seller, it would have expressed itself far more clearly. Because any system of priorities ultimately attenuates the yield for those for whom Congress was less solicitous, the expressions of those priorities should be strictly read and not expanded unless plainly mandated.

The second truth is that reorganization under Chapter 11 is one of the desired aims of Congress for the financially pressed but honest debtor. The care Congress took in enacting Chapter 11 as "a carefully matured enactment", *Guessefeldt v. McGrath*, 342 U.S. 308, 319, 72 S.Ct. 338, 344, 96 L.Ed. 342 (1952), is reflected in the exhaustive discussions and numerous changes made before enactment of the final version. To achieve reorganization for the benefit of debtors and creditors alike, Congress gave the court the latitude Section 546(c)(2) gives it to ensure that the debtor's continued operation would not be adversely affected by the improvident grant to a seller of the right to retrieve its goods in the debtor's possession.

Section 546(c)(2) must therefore be read as striking a balance so that the debtor has the use of the goods it needs for its ongoing business while the seller has their value. To give the seller more, absent a clear indication that this should be so, cuts against the grain of compelling bankruptcy themes. In short, Congress' coverage of the reclaiming seller is vital to the Chapter 11 mission. See *Powell v. U. S. Cartridge Co.*, 339 U.S. 497, 516, 70 S.Ct. 755, 765, 94 L.Ed. 1017 (1950).

### III.

### THE POSITION OF THE COMMITTEE OF UNSECURED CREDITORS

Within a few days of the filing of the Chapter 11 petitions, the debtors in possession,[10] sought an order which would give them (and certain entities not before this court) financing from General Electric Credit Corporation (GECC), a pre-petition secured lender which was owed more than $22 million when the Chapter 11 petitions were filed.

In the meantime, an eleven entity committee of unsecured creditors was chosen by the United States Trustee in keeping with Section 151102(a) of the Code, applicable to this, a United States Trustee pilot district.[11]

Mindful of the teaching of *In re Texlon Corp.*, 596 F.2d 1092 (2d Cir. 1979), and of the requirements of Sections 364(b), (c), and (d) that the court "after notice and hearing" authorize the debtor in possession[12] to obtain credit in accordance with the modes described in those sections, notice was given of a hearing before this court concerning the reach of the future borrowings. At that hearing, the court sensed the reach of GECC's conditions for its extension of credit, Section 364(c), and raised the question of the status of reclaiming sellers under Section 546(c). Counsel to the creditors' committee agreed with the court's feeling that if GECC were to be given the protections it insisted upon, it would prime everybody

---

10. The debtor-defendant in this suit to reclaim property is one of seven related debtors, each of which filed its own petition. Some nonoperating companies, affiliates within the meaning given by Section 101(2) of the Code, have not filed petitions.

11. This committee was later expanded to 13 members.

12. While Section 364 speaks to a trustee's authority to obtain credit, its provisions apply in a Chapter 11 case by the force of Section 103(a) and under Section 1107 the debtor in possession has the same rights and powers as a Chapter 11 trustee appointed under Section 1104(a).

including reclaiming sellers and thus make resort to Section 546(c)(2) a futile exercise.[13]

Finally, after some colloquy touching on the reach of Section 546(c)(2)(A), the grant of administrative expense status in lieu of reclamation, the court entered into a financing order which, with GECC's consent, subordinated its Section 364(c) status to

> "administration claims fixed by court order pursuant to § 546(c)(2) of the Code . . .".

Counsel to the committee accepted this but on the argument of this suit by McCain to reclaim its foodstuffs insisted that the financing order should be vacated "by virtue of mutual mistake" in that counsel assumed (and apparently advised creditors) that the administrative claims contemplated by the decretal paragraph set out above would be fixed for the total invoice value of the goods whether or not the debtor had any left.

█ There are three short answers to the position taken by counsel to *all* the unsecured creditors.[14] First, there is nothing in the statute nor in the *Texlon* case, *supra*, which insists that the creditors must consent to the grant of relief which the court considers proper upon its appraisal of relevant criteria. How, in the circumstances of a Chapter 11 case, the matter of financing to protect the debtor and the creditors under Section 364 is to be achieved, calls for the court to exercise its judgment given the nature of the debtor, its immediate need for money, the availability of financing, the stage of the case when financing is sought and the like. Were the court bound to follow only the recommendation of the handful of creditors making up the committee, deserving cases would fall and unde-

serving ones survive. Such a practice would be too great a wrench on the judicial function in the bankruptcy process.

Second, counsel's joinder in the court's judgment based on what the former thought the reach of Section 546(c) to be, affords no reason to undo what the order so plainly spells out. The construction of statutes is the province of the judiciary.

Third, counsel could have appealed the order if it were unsure that Section 546(c) would be read to mean what the court is now told counsel thought it meant. Or counsel could have taken its position plainly and asked the court to rule there and then on the extent of the reclaiming seller's priority. In view of the court's compelled reading of the section it is not clear what counsel could have done to alter the course of these Chapter 11 cases.

### IV.

### THE JUDGMENT

Judgment is rendered for the plaintiff to the extent its goods were in the debtor's possession on the filing date.[15] The amount of that judgment is allowed as an administrative priority within the meaning of Section 503 of the Code. Unless it is paid within a reasonable period, the court will entertain a motion for an order directing it be paid pursuant to Section 503(a).

The oral motion by the creditors' committee to set aside the financing order is denied.

Settle an order on five days notice.

---

**13.** The court took its cue from its knowledge that by the time of the hearing, a host of sellers had taken the steps described in Section 546(c)(1).

**14.** The court finds the position taken by counsel to be somewhat ambiguous to place a benign cast on it. Presumably the committee is made up of and should consist of a large number of purely unsecured creditors (the petition places the aggregate of such debt at about $10 million) none or very few of whom would be

entitled to any priority. These would share in the proposals for them made in the reorganization plan. It appears that counsel is pressing for the handful of creditors numberwise and dollarwise who come within Section 546(c) and is charged with knowledge that the expansion of their priority as contended for must reduce the yield for everyone else.

**15.** See note 4, *supra*.