964 F.2d 842
 26 Collier Bankr.Cas.2d 1663, 23 Bankr.Ct.Dec. 12,
Bankr. L. Rep. P 74,639, 17 UCC Rep.Serv.2d 1138
 In re PESTER REFINING COMPANY, Debtor.
PESTER REFINING COMPANY, Appellant,
v.
ETHYL CORPORATION, Appellee.
In re PESTER REFINING COMPANY, Debtor.
PESTER REFINING COMPANY, Appellant,
v.
ETHYL CORPORATION, Appellee,
The Official Unsecured Creditors Committee, Intervenor Below.
In re PESTER REFINING COMPANY, Debtor.
PESTER REFINING COMPANY, Appellee,
v.
ETHYL CORPORATION, Appellant,
The Official Unsecured Creditors Committee, Intervenor Below.
 Nos. 90-1457, 91-1946, 91-1985.
 United States Court of Appeals,
Eighth Circuit.
 Submitted Oct. 14, 1991.
Decided May 22, 1992.
 
 John G. Fletcher, argued (September Wethington-Smith, on the brief), Des Moines, Iowa, for appellant.
 James M. Holcomb, argued (Robert A. Sims, on the brief), Des Moines, Iowa, for appellee.
 Before WOLLMAN, Circuit Judge, BRIGHT, Senior Circuit Judge, and LOKEN, Circuit Judge.
 LOKEN, Circuit Judge.
 
 
 1
 Pester Refining Company, a reorganized Chapter 11 debtor, appeals the district court's[1] post-confirmation money judgment to satisfy Ethyl Corporation's priority claim under § 2-702 of the Uniform Commercial Code and § 546(c) of the Bankruptcy Code to reclaim goods sold to Pester while insolvent. Ethyl cross appeals, arguing that the district court should have awarded post-judgment interest from the date Pester's Plan of Reorganization was confirmed. We modify the bankruptcy court's denial of interest and otherwise affirm.
 
 I. The Factual Setting
 
 2
 On February 19 and 22, 1985, Ethyl delivered 6,000 gallons of a gasoline additive in a railroad tank car and twelve fifty-five gallon drums of an antioxidant to Pester's refinery in El Dorado, Kansas. Ethyl invoiced the insolvent Pester $126,995.44 for these credit sales. On February 25, Pester filed for protection under Chapter 11 of the Bankruptcy Code.
 
 
 3
 On February 27, Pester received Ethyl's written demand to reclaim the chemicals. Though the chemicals were still on hand and identifiable, they were also subject to perfected security interests of various secured creditors whose secured claims exceeded the value of Pester's assets. When Pester refused to return the chemicals, Ethyl filed this adversary complaint for reclamation under § 546(c) of the Bankruptcy Code.
 
 
 4
 On March 21, 1986, with Ethyl's reclamation suit still pending, the bankruptcy court confirmed a Plan of Reorganization for Pester and affiliated debtor companies. The Plan treated reclamation claimants as an impaired class of creditors and gave each the choice of settling or pursuing its reclamation claim. Ethyl was the only one that did not settle.
 
 
 5
 After trial, the bankruptcy court upheld Ethyl's right of reclamation in the amount of its invoices, $126,995.44. Rather than specify a source of funds to pay this claim, the bankruptcy court entered judgment in that amount and directed that, if Pester failed to pay, Ethyl could pursue its judgment remedies under state and federal law. The district court affirmed, and this appeal followed. We have jurisdiction under 28 U.S.C. § 158(d).
 
 II. The Statutory Framework
 
 6
 This appeal concerns a seller's right to reclaim goods from a buyer in bankruptcy when the goods are subject to superior competing claims of the buyer's secured creditors. Reclamation is the right of a seller to recover possession of goods delivered to an insolvent buyer. It is a rescissional remedy, based upon the theory that the seller has been defrauded. Indeed, at common law and under the Uniform Sales Act, the seller could only reclaim goods by proving that the buyer fraudulently induced delivery by misrepresenting its solvency. See generally Robert Braucher, Reclamation of Goods from a Fraudulent Buyer, 65 Mich.L.Rev. 1281, 1283 (1967).
 
 
 7
 The Uniform Commercial Code expanded the remedy by defining a narrow class of cases in which reclamation would be allowed without proof of a misrepresentation as to solvency.
 
 
 8
 (2) Where the seller discovers that the buyer has received goods on credit while insolvent he may reclaim the goods upon demand made within ten (10) days after the receipt....
 
 
 9
 UCC § 2-702(2). Confirming that the remedy was still grounded in fraud, the official commentary to § 2-702[2] stated:
 
 
 10
 Subsection (2) takes as its base line the proposition that any receipt of goods on credit by an insolvent buyer amounts to a tacit business misrepresentation of solvency and therefore is fraudulent.
 
 
 11
 However, recognizing that the seller by delivering has vested the buyer with apparent authority to deal with the goods, the UCC also made the seller's reclamation right "subject to" the rights of good faith purchasers from the buyer:
 
 
 12
 (3) The seller's right to reclaim under subsection (2) is subject to the rights of a buyer in ordinary course or other good faith purchaser under this article (Section 84-2-403). Successful reclamation of goods excludes all other remedies with respect to them.
 
 
 13
 Kan.Stat.Ann. § 84-2-702(3). Since most secured creditors are good faith purchasers under the UCC, § 84-2-702 has the effect, in priority terms, of placing the reclaiming seller behind the insolvent buyer's secured creditors who have security interests in the goods, but ahead of the buyer's general unsecured creditors. See Iola State Bank v. Bolan, 235 Kan. 175, 679 P.2d 720, 726-28 (1984), following Matter of Samuels & Co., 526 F.2d 1238 (5th Cir.), cert. denied, 429 U.S. 834, 97 S.Ct. 98, 50 L.Ed.2d 99 (1976). This prioritizing is consistent with the historic roots of the reclamation remedy.
 
 
 14
 The UCC's reclamation provisions raised many questions under the pre-Code bankruptcy laws, spawning nearly two decades of litigation between trustees and reclaiming sellers.[3] Congress responded with § 546(c) of the Code:
 
 
 15
 (c) ... [T]he rights and powers of a trustee under sections 544(a), 545, 547, and 549 of this title are subject to any statutory or common-law right of a seller of goods that has sold goods to the debtor, in the ordinary course of such seller's business, to reclaim such goods if the debtor has received such goods while insolvent, but
 
 
 16
 (1) such a seller may not reclaim any such goods unless such seller demands in writing reclamation of such goods before ten days after receipt of such goods by the debtor; and
 
 
 17
 (2) the court may deny reclamation to a seller with such a right of reclamation that has made such a demand only if the court--
 
 
 18
 (A) grants the claim of such a seller priority as a claim of a kind specified in section 503(b) of this title; or
 
 
 19
 (B) secures such claim by a lien.
 
 
 20
 Section 546(c) recognizes, with some limitations,[4] the seller's state law right to reclaim under § 84-2-702, but also gives the bankruptcy court broad power to substitute a lien or a priority claim for the seller's right to reclaim possession. This remedial discretion allows the court to leave the goods in the debtor's possession to facilitate a Chapter 11 reorganization. It also provides flexibility in enforcing secured creditors' superior rights. See Matter of Griffin Retreading Co., 795 F.2d 676, 679 (8th Cir.1986).
 
 III. Does Ethyl Have a Right To Reclaim
 
 21
 On this appeal, we begin with uncontested findings that Ethyl satisfied the statutory prerequisites for reclamation under § 546(c) and Kan.Stat.Ann. § 84-2-702(2): (1) Ethyl sold the chemicals in the ordinary course of its business; (2) Pester received the chemicals while insolvent; (3) Ethyl demanded return of the chemicals in writing within ten days after Pester received them; and (4) Pester was still in possession of the chemicals when it received Ethyl's reclamation demand. See Griffin Retreading Co., 795 F.2d at 679.
 
 
 22
 However, Ethyl's right to reclaim is "subject to" the rights of good faith purchasers, § 84-2-702(3). When Pester received the chemicals from Ethyl, it owed some $42,000,000 to various secured creditors who held perfected floating security interests in Pester's property, including the chemicals. It is undisputed that these secured creditors were good faith purchasers, and that their security interests were undersecured when Pester filed its petition for Chapter 11 protection. Pester argues that the mere presence of secured creditors with superior rights under § 84-2-702(3) extinguished Ethyl's right of reclamation.
 
 
 23
 This contention does obvious violence to the statutory language. In the UCC context, when the right to reclaim is "subject to" the rights of secured creditors, that means the right is subordinate or inferior to the security interests, not that it is automatically and totally extinguished. See Toyota Ind. Trucks U.S.A., Inc. v. Citizens Nat'l Bank, 611 F.2d 465, 473 & n. 6 (3d Cir.1979). See also Michelin Tires (Can.) Ltd. v. First Nat'l Bank, 666 F.2d 673, 677 (1st Cir.1981) (construing "subject to" in § 9-318(1)). Therefore, after the secured creditors' superior interests have been satisfied or released, the reclaiming seller retains a priority interest in any remaining goods, and in any surplus proceeds from the secured creditors' foreclosure sale.
 
 
 24
 This was the precise issue decided in United States v. Westside Bank, 732 F.2d 1258 (5th Cir.1984), a non-bankruptcy case. The seller made a timely reclamation demand. The secured creditor foreclosed upon and sold all the buyer's assets, including the goods subject to reclamation. The district court held that the seller's right of reclamation was extinguished by the foreclosure. The Fifth Circuit reversed, holding that the reclamation seller retained a priority interest in any surplus proceeds traceable to the goods. The court explained that this result is appropriate under the UCC whether the reclamation right is viewed as an Article 2 limitation on the secured party's right to dispose of collateral, as an Article 9 junior security interest, or as the debtor's ownership interest in traceable proceeds. 732 F.2d at 1262-63.
 
 
 25
 To our knowledge, although the case law is inconsistent in other respects, Westside Bank's interpretation of the "subject to" language in § 84-2-702(3) has been followed in every reported bankruptcy decision that has considered the question. See, e.g., In re Roberts Hardware, 103 B.R. 396, 398 (Bankr.N.D.N.Y.1988); Matter of Bosler Supply Group, 74 B.R. 250, 253 (N.D.Ill.1987); In re Wathen's Elevators Inc., 32 B.R. 912, 923 (Bankr.W.D.Ky.1983); In re Western Farmers Ass'n, 6 B.R. 432, 436 (Bankr.W.D.Wash.1980).
 
 
 26
 Pester cites In re Coast Trading Co., 744 F.2d 686, 692 (9th Cir.1984), as supporting its contention that the mere presence of a secured creditor with a security interest in the goods to be reclaimed extinguishes the seller's right to reclaim. But Coast Trading is distinguishable from the above-cited cases in one critical respect--the seller had drop-shipped the goods to the buyer's customer, so they were not in the buyer's possession when reclamation was demanded. Factually, this puts Coast Trading in the mainstream of UCC cases holding that the seller may only reclaim goods in the buyer's possession.[5] The Coast Trading opinion emphasized this fact in distinguishing the above-cited decision in Western Farmers:
 
 
 27
 In Western Farmers the court found that the sellers had a reclamation right subject to the interest of a secured inventory creditor.... Thus, in Western Farmers the sellers had a valid, although subordinated, reclamation right.... Collingswood has not demonstrated any such right to reclaim goods or proceeds; therefore it is not eligible for an administrative priority under section 546.
 
 
 28
 744 F.2d at 692. Accordingly, we agree with the district court that Ethyl's right to reclaim was not extinguished because Pester had secured creditors with perfected security interests in the chemicals Ethyl sought to reclaim.[6]IV. Is the Right Worthless
 
 
 29
 Determining that Ethyl's right to reclaim exists is easier than determining what it is worth. Pester argues that the claim is worthless because the secured creditors' claims exceeded the value of all of Pester's assets when the Chapter 11 proceeding was commenced. Ethyl argues, and the bankruptcy court apparently held, that Ethyl may recover its entire reclamation claim from any assets of the reorganized Pester because the superior secured creditors' claims were satisfied in the Plan of Reorganization. We reject both of these contentions as inconsistent with the delicate balance codified in § 546(c) of the Code.
 
 
 30
 Once again, our § 546(c) analysis must begin with state law. Under the UCC, if an undersecured secured creditor forecloses on the goods to be reclaimed and uses the entire proceeds to pay down its secured debt, the seller's reclamation right is extinguished. Even if the buyer has additional assets, the seller's right to reclaim affords it no priority interest in those assets; it is relegated to its unsecured claim for the purchase price. See § 84-9-504(4). On the other hand, if the secured creditor releases its security interest in the goods to be reclaimed, the seller may enforce its right to reclaim, even if the resulting reduction in the buyer's assets impairs the secured creditor's position. In other words, in the non-bankruptcy context, the secured creditor's decision with respect to its security interest in the goods will determine the value of the seller's right to reclaim.
 
 
 31
 Because the purpose of § 546(c) is "to recognize, in part, the validity of section 2-702 of the Uniform Commercial Code,"[7] we think these distinctions must be recognized in determining the value in bankruptcy of a seller's reclamation right that is subject to superior secured creditor interests. Thus, Pester's argument--that the claim is worth nothing because the secured creditors were undersecured at the outset--ignores the freedom of secured creditors in non-bankruptcy contexts to relinquish all or part of their security interests. And Ethyl's argument--that the claim is worth full value because the secured creditors have been satisfied--ignores the possibility that they were satisfied by the goods to be reclaimed, rather than by other Pester assets, in which case the right to reclaim would be extinguished (rendered valueless) under state law. This distinction was recognized in In re Video King of Ill., Inc., 100 B.R. 1008, 1016-17 (Bankr.N.D.Ill.1989), although only in dicta in a pretrial opinion denying cross motions for summary judgment.
 
 
 32
 The bankruptcy court reasoned that Ethyl must be given an administrative expense priority, or a lien, for the full value of its right to reclaim because § 546(c)(2) permits the court to "deny reclamation to a seller with such a right of reclamation ... only if the court: (A) grants the claim of such a seller [administrative claim] priority ... or (B) secures such claim by a lien." (emphasis added). We disagree. When there are goods or traceable proceeds available to reclaim, the alternative remedies in § 546(c)(2) provide needed flexibility. But when the secured creditors have satisfied their claims out of the goods to be reclaimed, granting § 546(c)(2) relief would afford the reclamation seller something it does not have under the UCC--a priority interest in the buyer's assets other than the goods to be reclaimed. See Action Ind., Inc. v. Dixie Ent., Inc., 22 B.R. 855, 860 (Bankr.S.D.Ohio 1982). Nothing in the text or legislative history of § 546(c) suggests that Congress intended to expand the state law rights of reclamation sellers at the expense of the bankrupt's unsecured creditors. In this situation, the bankruptcy court does not "deny reclamation" in recognizing that the reclamation right no longer has value; therefore, the alternative remedies of § 546(c)(2) do not come into play.
 
 
 33
 Because Ethyl's subordinate right of reclamation existed when Pester commenced its Chapter 11 proceeding, but was subject to being rendered valueless by the actions of Pester's secured creditors, we must now take a closer look at the details of Pester's confirmed Plan of Reorganization, the document that defined the extent to which, and the manner in which, Pester's various classes of creditors would share in this debtor's estate.
 
 V. Construing the Plan
 
 34
 Under the Plan of Reorganization, Pester transferred its refinery assets (including any chemicals subject to Ethyl's right to reclaim) to Derby Refining Company in exchange for fifty-four self service gas stations that Derby either owned or leased. The Plan also accomplished the financial restructuring of Pester, classified the claims and interests of its creditors, and provided for the treatment of impaired and unimpaired classes of creditors.
 
 
 35
 Although the parties and the bankruptcy court focused upon the provisions of the Plan dealing with reclamation creditors such as Ethyl, under our analysis of § 546(c) the more important focus is its treatment of the secured creditors who had superior rights in the chemicals Ethyl sought to reclaim. If the Plan in fact satisfied the claims of those creditors with the chemicals, or their proceeds, then Ethyl's right to reclaim would be valueless.
 
 
 36
 The Plan placed the relevant secured creditors in two different classes. Secured creditors in each class released their respective liens on Pester's assets, including any chemicals--an essential provision since those assets were being conveyed to Derby. Their secured claims were deemed satisfied by the Plan, and they waived any deficiency claims. In exchange, these creditors received value from the following sources:
 
 
 37
 . $22,000,000 from Pester Marketing Company (PMC), the debtor that will operate the service stations obtained from Derby, $6,000,000 payable at confirmation and the rest over a ten year period.
 
 
 38
 . A $2,000,000 note from Pester, secured by a promissory note Pester received in the agreement with Derby.
 
 
 39
 . $1,230,515 from Pester, over ten years without interest, secured by subordinate liens on the assets received from Derby.
 
 
 40
 . Payment of a revolving credit loan at confirmation, "by using [Pester] cash or PMC cash."
 
 
 41
 . Pester's variable rate $9,000,000 ten-year note.
 
 
 42
 . Class B stock in PMC.
 
 
 43
 . $2,600,000 in notes payable from a reversionary interest in Pester's pension plan and secured by a condominium owned by PMC.
 
 
 44
 . PMC's $750,000 ten-year note.
 
 
 45
 . Any proceeds from a pending lawsuit after the first $300,000 is paid to the settling reclamation creditors.
 
 
 46
 Under these terms, we think it apparent that the secured creditors elected to release their secured interests in the chemicals Ethyl sought to reclaim in exchange for payments from sources other than the proceeds from those chemicals. This they were free to do, subject to bankruptcy court approval through confirmation, to facilitate Pester's reorganization. Because the secured creditors released their superior liens and satisfied their claims from unrelated assets and income sources, the bankruptcy court properly valued Ethyl's right to reclaim at the full invoice price of the chemicals.[8]
 
 
 47
 Pester argues that Ethyl is estopped and barred from asserting any right it had to the alternative remedies allowed by § 546(c) because the confirmed Plan, as explained in the debtors' Disclosure Statement and as subsequently modified, expressly excludes reclamation claimants from administrative expense priority. Therefore, Ethyl must be relegated to an unsecured creditor status. The bankruptcy court rejected this argument, after examining the relevant terms of the Plan, the Disclosure Statement, and the modifying Master Agreement in great detail. We agree with its analysis of these documents. We also note that the Plan expressly provides that non-settling reclamation claimants, such as Ethyl, "will receive payment in full of the amount finally determined to be due by Court order." Thus, the Plan does not bar, but expressly contemplates, the judgment entered by the bankruptcy court after it sustained Ethyl's reclamation claim.
 
 VI. The Interest Issue
 
 48
 Ethyl cross appeals the denial of post-judgment interest from the date of confirmation of the Plan (March 1986). In denying post-judgment interest, the bankruptcy court reasoned that § 84-2-702 does not provide for the payment of interest. However, even in a non-bankruptcy context, we have held that federal law governs whether post-judgment interest is awarded on a judgment in an action otherwise governed by state law. See, e.g., Schumann v. Levi, 728 F.2d 1141, 1143 (8th Cir.1984) (seller's action for the price under the Minnesota UCC). Under federal law, "interest shall be allowed on any money judgment in a civil case recovered in a district court." 28 U.S.C. § 1961. Because a bankruptcy court is part of the district court, the statute applies to bankruptcy proceedings. See, e.g., Firestone Tire & Rubber Co. v. Goldblatt Bros., 61 B.R. 459, 466 n. 4 (Bankr.N.D.Ill.1986); In re Southern Ind. Banking Corp., 87 B.R. 518, 520 (Bankr.E.D.Tenn.1988).
 
 
 49
 The bankruptcy court also reasoned that most prior cases have denied interest on § 546(c) claims. See Western Farmers, 6 B.R. at 435-36. That is true, but those were pre-confirmation judgments providing the relief specified under § 546(c), either possession of the goods, or administrative claim priority, or a lien. Here, on the other hand, the bankruptcy court entered a post-confirmation money judgment (i) enforcing the provision in the Plan stating that "reclamation claimants will receive payment in full of the amount finally determined to be due by Court order," and (ii) stating that the judgment would be enforced by "remedies available to [Ethyl] under state and federal law."
 
 
 50
 In these circumstances, we think the relevant question is whether the Plan contained provisions overriding the normal federal post-judgment interest provisions of § 1961, as in Ocasek v. Manville Corp. Asbestos Disease Comp. Fund, 956 F.2d 152, 154 (7th Cir.1992). As the bankruptcy court noted, Pester's Plan does not provide for interest on any reclamation claim. Interest under § 1961 runs only from the "date of judgment." Kaiser Alum. & Chem. Corp. v. Bonjorno, 494 U.S. 827, 110 S.Ct. 1570, 1576, 108 L.Ed.2d 842 (1990). Here, the Plan did not award Ethyl a judgment on its claim; the Plan only saved Ethyl's claim from discharge under § 1141(d)(1)(A). For this reason, we agree with the bankruptcy court that Ethyl is not entitled to interest from the date of confirmation. The Plan's silence on the question of interest cannot be construed as reflecting an intent to depart from the normal rule of § 1961 by granting Ethyl post-judgment interest from the date of confirmation.
 
 
 51
 There remains a question not considered by the bankruptcy court--whether Ethyl is entitled to post-judgment interest from the date of that court's judgment.[9] On this question, the Plan's silence as to interest is more ambiguous, and we know of no relevant precedents. Because of the overriding federal policy in favor of post-judgment interest reflected in § 1961, we conclude that the Plan provision calling for "payment in full of the amount finally determined to be due by Court order" must be deemed to have contemplated post-judgment interest on that court order. Therefore, Ethyl is entitled to post-judgment interest on its money judgment from the date of the judgment, September 19, 1990.
 
 
 52
 The judgment of the district court is modified to provide for post-judgment interest in accordance with 28 U.S.C. § 1961 from September 19, 1990. As so modified, the judgment is affirmed.
 
 
 
 [1]
 The HONORABLE HAROLD D. VIETOR, Chief Judge of the United States District Court for the Southern District of Iowa. The district court summarily affirmed the decision of the HONORABLE RUSSELL J. HILL, United States Bankruptcy Judge for the Southern District of Iowa
 
 
 [2]
 Kansas law governs this transaction. Kansas has adopted the UCC and its numbering methodology in Chapter 84 of the Kansas Statutes. Thus, UCC § 2-702 is found at Kan.Stat.Ann. § 84-2-702. The remainder of this opinion will cite to the Kansas provisions, rather than their UCC counterparts
 
 
 [3]
 See Matter of PFA Farmers Market Ass'n, 583 F.2d 992 (8th Cir.1978). See generally Richard Mann & Michael Phillips, Section 546(c) of the Bankruptcy Reform Act: An Imperfect Resolution of the Conflict Between the Reclaiming Seller and the Bankruptcy Trustee, 54 Amer.Bankr.L.J. 239, 241-57 (1980)
 
 
 [4]
 Unlike the UCC, § 546(c) is limited to sellers in the ordinary course of business who make a written reclamation demand within ten days of the buyer's receipt of the goods
 
 
 [5]
 See, e.g., In re Rawson Food Serv., Inc., 846 F.2d 1343, 1347 (11th Cir.1988); In re Intercity Oil Co., 122 B.R. 358 (Bankr.W.D.Wis.1990); Archer Daniels Midland Co. v. Charter Int'l Oil Co., 60 B.R. 854, 856 (M.D.Fla.1986); Matter of Flagstaff Foodserv. Corp., 14 B.R. 462, 465 (Bankr.S.D.N.Y.1981). These cases reflect the origins of reclamation as a rescissional, possessory remedy. Matter of Griffin Retreading is not to the contrary; in Griffin the buyer sold the goods after receiving the seller's reclamation demand, 795 F.2d at 677. See Intercity Oil Co., 122 B.R. at 360
 
 
 [6]
 We also reject Pester's argument that the presence of secured creditors with "super-priority" status under § 364(c) (1) & (3) precludes § 546(c) relief. See In re Diversified Food Serv. Distrib., Inc., 130 B.R. 427 (Bankr.S.D.N.Y.1991)
 
 
 [7]
 S.Rep. No. 95-989, 95th Cong., 2d Sess., reprinted in 1978 U.S.C.C.A.N. 5787, 5873
 
 
 [8]
 We summarily reject Pester's contention that the district court erred in valuing the chemicals at Ethyl's invoice price, instead of a lower fair market value that witnesses for Pester urged at trial. The court's finding that Ethyl's invoice prices were the fair market prices for the chemicals is not clearly erroneous. A reclaiming seller under § 546(c) is entitled to more than the "garage sale" price its goods would bring if resold not in the ordinary course of business. See In re Performance Papers, Inc., 119 B.R. 127, 130 (Bankr.W.D.Mich.1990)
 
 
 [9]
 Post-judgment interest is calculated from the "date on which the original judgment was entered in the initial trial court proceeding and not the date of affirmance on appeal." Total Petroleum, Inc. v. Davis, 822 F.2d 734, 738 (8th Cir.1987)