In re UTILITY STATIONERY STORES, INC., Debtor.

UTILITY STATIONERY STORES, INC., Plaintiff,

v.

AMERICAN PORTFOLIO, Defendant.

UTILITY STATIONERY STORES, INC., Plaintiff,

v.

The CHUCKEMAN COMPANY, Defendant.

UTILITY STATIONERY STORES, INC., Plaintiff,

v.

AMERICAN PAD & PAPER COMPANY, Defendant.

UTILITY STATIONERY STORES, INC., Plaintiff,

v.

ART SPECIALTY CO., INC., Defendant.

UTILITY STATIONERY STORES, INC., Plaintiff,

v.

DURACELL PRODUCTS COMPANY, Defendant.

UTILITY STATIONERY STORES, INC., Plaintiff,

v.

GATES OFFICE PAPERS, Defendant.

UTILITY STATIONERY STORES, INC., Plaintiff,

v.

SCHWARZ PAPER COMPANY, Defendant.

UTILITY STATIONERY STORES, INC., Plaintiff,

v.

QUALITY PARK PRODUCTS, Defendant.

**UTILITY STATIONERY STORES, INC., Plaintiff,**

v.

**SOUTHWORTH COMPANY, Defendant.**

Bankruptcy No. 80 B 3736.

Adv. Nos. 80 A 532, 80 A 546, 80 A 533, 80 A 531, 80 A 553, 80 A 551, 80 A 537, 80 A 544 and 80 A 539.

United States Bankruptcy Court, N. D. Illinois, E. D.

April 8, 1981.

Robert W. Hallock, Kirkland & Ellis, Chicago, Ill., for debtor.

## ORDER

LAWRENCE FISHER, Bankruptcy Judge.

This matter coming on to be heard upon the Complaint of Utility Stationery Stores, Inc., Debtor-in-Possession, to avoid as preferences within the meaning and purview of § 547(b) of the Bankruptcy Code certain payments made to the above-named Defendants, and to recover the payments pursuant to § 550(a) of the Bankruptcy Code, and upon Defendants' Answers thereto, and these proceedings having been consolidated for hearing on certain common issues, and

The Court having examined the pleadings filed in this matter, and having received and examined the evidence adduced, and having heard the testimony of witnesses and arguments of counsel, and having received and examined memoranda of the parties in support of their respective positions, and the Court being fully advised in the premises;

The Court Finds:[1]

1. Debtor, Utility Stationery Stores, Inc., is a wholly owned subsidiary of JMPH

---

1. Debtor has instituted a number of proceedings against various defendants seeking to avoid as preferences certain transfers made by Debtor within ninety days of the filing of the petition herein. The majority of these proceedings were consolidated for hearing on certain common issues and were tried before the Court on July 1 and 3, 1980. The remaining actions, those involving transfers to the instant Defend- ants, were consolidated for hearing on the same common issues and were tried before the Court on October 14 and 16, 1980. The parties to the instant proceedings stipulated to the admissibility of the transcript of the July hearing.

It is assumed for purposes of discussion that the instant Defendants adopt the positions

Enterprises, Inc. (JMPH). Debtor was originally named Utility Acquisition Corporation and was formed by JMPH for the purpose of purchasing the assets of the "Retail Division" of United Stationery Supply Co. JMPH bought the company's stock. In connection with the purchase of stock, JMPH obtained a loan, upon which the balance presently due is $65,000.00.

On or about March 27, 1978, in connection with the aforesaid purchase, Utility Acquisition Corporation and JMPH executed and delivered to Sears Bank and Trust Company a Loan and Security Agreement which provided Debtor a revolving line of credit of $400,000.00 secured by all Debtor's assets, including cash, accounts receivable, inventory, furniture and fixtures. Copies of the Loan and Security Agreement and the financing statement filed by Sears Bank and Trust Company in connection therewith were offered and received into evidence as Plaintiff's Exhibits Nos. 2 and 3, respectively. Of the initial proceeds of this loan, approximately $300,000.00 was applied toward purchase of the assets of the Retail Division, one of which was a one hundred percent shareholding interest in Utility Supply Company, a leaseholding corporation.

2. On or about July 10, 1979, JMPH purchased 72% of the stock in B. H. Hallin & Associates, Inc. (Hallin) from Bertrand H. Hallin, the principal shareholder of the Hallin family. Hallin was a telephone order service with a warehouse located at 150 North Clinton, Chicago, Illinois. The merchandise marketed by Hallin was identical to merchandise marketed by Debtor.

The contract for purchase of the Hallin stock was offered and received into evidence as Defendants' Exhibit No. 3. It provided that a certified check in the amount of $15,600.00 was to be paid to Mr. Hallin at the closing of the transaction. This amount was paid on behalf of JMPH by Debtor, Utility Stationery Stores, Inc. The balance presently due under the stock purchase agreement is $99,400.00.

In connection with the purchase of the Hallin stock, JMPH entered into a consulting agreement whereby it was to pay $2,000.00 each month to Bertrand H. Hallin. From July through December, 1979, these payments also were made on behalf of JMPH by Utility Stationery Stores, Inc.

3. Sometime during September or October of 1979, Hallin's business activities were merged with those of the Debtor, and separate books and records for the Hallin operation were no longer maintained. After October 1, 1979, all merchandise was ordered on behalf of Utility Stationery Stores, Inc. However, invoices were received and paid by Debtor after October 1, 1979 for goods which had been ordered on behalf of Hallin before the consolidation of the two businesses.

4. Utility Stationery Stores, Inc. incurred a loss for the fiscal year ended March 31, 1980 of over half a million dollars. During the period December 29, 1979 through March 28, 1980, Debtor closed three of the stores in its chain. In liquidating the inventories of stores scheduled for closing, a series of progressive markdowns was used, beginning with 25%, then 50%, and finally 75%. A substantial amount of the inventory at these stores could not be sold, even at a 75% reduction. Obsolete items from stores not scheduled for closing were also transferred to the closing stores for liquidation. The liquidation process began on December 1, 1979, and by March 28, 1980, Debtor had sold inventory worth approximately $400,000.00 at book value. The aggregate sales price received for these goods, before consideration of sales costs, was approximately $100,000.00.

5. On March 28, 1980, Utility Stationery Stores, Inc., JMPH, Hallin, and Utility Supply Company each filed a voluntary petition under chapter 11 of the Bankruptcy Code. Copies of the schedules filed on behalf of Utility Stationery Stores, Inc., Hallin, and Utility Supply Company were offered and

urged by defendants at the July hearing. Exhibits identified by number were admitted at

the July trial; exhibits identified by letter were admitted at the October trial.

received into evidence as Plaintiff's Exhibits Nos. 6, 7, and 8, respectively.

6. On or within ninety days before the date of the filing of its petition, Debtor, Utility Stationery Stores, Inc., made one or more payments to each of the Defendants herein on account of obligations owed by Debtor before the payments were made.

7. § 547(b) of the Bankruptcy Code provides as follows:

"(b) Except as provided in subsection (c) of this section, the trustee may avoid any transfer of property of the debtor—

(1) to or for the benefit of a creditor;

(2) for or on account of an antecedent debt owed by the debtor before such transfer was made;

(3) made while the debtor was insolvent;

(4) made—

(A) on or within 90 days before the date of the filing of the petition; or

(B) between 90 days and one year before the date of the filing of the petition, if such creditor at the time of such transfer—

(i) was an insider; and

(ii) had reasonable cause to believe the debtor was insolvent at the time of such transfer; and

(5) that enables such creditor to receive more than such creditor would receive if—

(A) the case were a case under chapter 7 of this title;

(B) the transfer had not been made; and

(C) such creditor received payment of such debt to the extent provided by the provisions of this title."

These adversary proceedings have been consolidated for trial on certain common issues, specifically, whether Debtor was insolvent at the time the payments were made, and whether the payments will enable Defendants to receive more than they would receive if the case were a case under chapter 7, the payments had not been made, and each Defendant received payment of its debt to the extent provided by the Bankruptcy Code.

8. Plaintiff called as a witness Henry Wisniewski, owner of 100% of the stock of JMPH and President of both Hallin and Utility Stationery Stores, Inc. Mr. Wisniewski, a certified public accountant and former partner in Arthur Anderson & Co., testified that he had examined the books and records of Utility Stationery Stores, Inc. and prepared a summary of its assets and liabilities as of December 31, 1979, January 31, 1980, and March 28, 1980. The summary indicates the book values at December 31, 1979 and March 28, 1980, and an estimate of the book values at January 31, 1980. It also indicates the "estimated recoverable" or fair market values at each of these dates as well as the liquidation values as of March 28, 1980. Only that portion of the document indicating book values as of December 31, 1979 [2] and March 28, 1980 was received into evidence as Plaintiff's Exhibit No. 1, pursuant to Federal Rule of Evidence 1006, providing for the admissibility of summaries of voluminous books and records. The books and records from which the summaries were prepared were produced by Plaintiff's counsel for inspection before trial. That portion of the summary which was admitted into evidence is as follows:

---

**2.** Under Bankruptcy Rule 906(a), the ninety day preference period prescribed by § 547(b) of the Bankruptcy Code is to be computed in accordance with F.R.C.P. 6(a). *In re Grimaldi*, 3 B.R. 533, 6 B.C.D. 241 (Bkrtcy.D.Conn., 1980). F.R.C.P. 6(a) provides that in computing a period of time under any applicable statute, the day of the act from which the designated period of time begins to run shall not be included. The last day shall be included unless it is a Saturday, Sunday, or legal holiday, in which event the period runs until the next day which does not fall on a Saturday, Sunday, or

legal holiday. Thus computed, the ninety day period in the instant case began on December 28, 1979. The balance sheet contained in Plaintiff's Exhibit No. 1 described Debtor's assets and liabilities existing on December 31, 1979, as does most of the testimony concerning Debtor's financial condition at about this period of time. There is no evidence that Debtor's condition was materially different on December 28, 1979, and Debtor's solvency *vel non* at the beginning of the ninety day period will be ascertained from the evidence relating to December 31, 1979.

UTILITY STATIONERY STORES INC.

SUMMARY OF ASSETS AND LIABILITIES

| | December 31, 1979 (Unadjusted) Per Books | March 28, 1980 (Unadjusted) Per Books |
|---|---|---|
| Cash | $ (15,515) | $ --0-- |
| Accounts Receivable | 329,340 | 179,649 |
| Inventory | 815,334 | 427,000 |
| All Other Assets | 150,143 | 130,000 |
| Total | 1,279,302 | 736,649 |
| Liabilities | 1,646,246 | 1,553,483 |
| Excess of Liabilities Over Assets | $ 366,944 | $ 816,834 |

| Detail of Liabilities – | |
|---|---|
| Secured | $ 327,112 |
| Priority Claims | 79,009 |
| | $ 406,121 |
| Unsecured | $1,147,362 |
| Total Liabilities | $1,553,483 |

The figures shown above do not include over $200,000.00 in negative goodwill. The negative cash figure for December 31, 1979 represents an overdraft which was added to the secured loan in later calculations in accordance with the agreement between Debtor and Sears Bank and Trust Company. Cash sales for December 31, 1979 were approximately $12,000.00. This amount would have been taken to the bank that afternoon and, if arriving after three o'clock, would have been posted to Debtor's account the following business day.

9. Because of the merger of Hallin's business activities with those of Debtor in September or October of 1979 and the consolidation of their books and records, the figures listed in Plaintiff's Exhibit No. 1 include assets and liabilities attributable to Hallin. However, Hallin's only assets at December 31, 1979 were $57,500.00 worth of inventory located at the Hallin warehouse. Hallin's liabilities at December 31, 1979 amounted to $152,869.00, including $65,000.00 of secured and $87,869.00 of unsecured debt.

No Hallin assets are included in the figures for March 28, 1980, and the only Hallin liability included is a secured obligation to Sears Bank and Trust Company in the amount of $57,500.00.

10. Plaintiff's Exhibit No. 1 also includes in the figures for both December 31, 1979 and March 28, 1980 purchase obligations of JMPH totalling $164,400.00, including $99,400.00 due on the purchase of the Hallin stock and $65,000.00 due in connection with the purchase of stock in the Retail Division. The figures for March 28, 1980 include an obligation of Debtor's subsidiary, Utility Supply Company, to Miles Management in the amount of $11,010.00.

11. Mr. Wisniewski testified that Debtor has made certain leasehold improvements on stores that were scheduled for closing after December 31, 1979. The improvements would be forfeited upon termination of the lease, and they were accordingly written off Debtor's books. However, they were written off on or before December 31, 1979, at which time the stores were still open and the leases were still in effect.

12. In addition to his testimony concerning book value, Mr. Wisniewski gave his estimates as to the fair market or going concern value of each asset category represented on Plaintiff's Exhibit No. 1. The accounts receivable book figure is net of a bad debt reserve in the amount of $64,306.00. Mr. Wisniewski added this amount to the book figure for accounts receivable and applied an aging process to obtain the fair market value. All receivables from zero to sixty days old were treated as 100% recoverable; receivables sixty-one to ninety days old, 75% recoverable; receivables ninety-one to one hundred twenty days old, 50% recoverable; and receivables over one hundred twenty days old, 25% recoverable. Using this method, the fair market value of accounts receivable on March 28, 1980 would be approximately $107,000.00.

Mr. Wisniewski testified that in his opinion the inventory at December 31, 1979 had a fair market value of only $500,000.00. Part of the deduction is attributable to $97,000.00 worth of inventory acquired from Hallin which was obsolete and valued at zero.

The major part of the deduction is attributable to inventory shrinkage. Debtor uses

the retail inventory method, whereby purchases for each month are added to a known physical inventory, taken once a year, and sales for the month are deducted at cost. A physical inventory was taken under the supervision of Arthur Anderson & Co. on March 31, 1979. The next physical inventory was taken approximately one year later, on March 28, 1980. At that time, the book value of inventory, obtained through the retail inventory method, exceeded the physical inventory count of March 28, 1980 by approximately $170,000.00. In determining fair market value, Mr. Wisniewski deducted this entire amount from the December 31, 1979 book figure for inventory.

The book value of $427,000.00 for inventory at March 28, 1980 is already adjusted to reflect inventory shrinkage. Mr. Wisniewski testified that in his opinion, the March 28, 1980 inventory had a fair market value of $330,000.00. He arrived at this figure by deducting the $97,000.00 worth of inventory in Debtor's stores that had been acquired from Hallin and was considered valueless.

The category "all other assets" in Plaintiff's Exhibit No. 1 includes furniture, fixtures, deposits with landlord, sales tax deposits, prepaid expenses, and leasehold interests. The fair market value of assets in this category, bearing a book value at December 31, 1979 of $150,143.00 and at March 28, 1980 of $130,000.00, was given as $120,000.00 for both relevant dates.

13. Mr. Wisniewski further testified as to the liquidation value of Debtor's assets at March 28, 1980. He estimated that of the $179,649.00 in accounts receivable, approximately $90,000.00 would be recoverable in liquidation. With regard to the inventory, Mr. Wisniewski stated that he had attended auctions at which similar inventory was sold and that the average rate of return based on book value was 15%. He accordingly gave the liquidation value of the inventory as $65,000.00. He testified that the liquidation value of all other assets, book valued at $130,000.00, would be approximately $50,000.00, including $20,000.00 for

recovery of deposits and an additional amount representing realization on leasehold interests.

14. Plaintiff called as an expert witness Robert F. Urgo, a partner in the investment banking firm of Hendrick Urgo & Company. Mr. Urgo has been engaged in the valuation of businesses for the past eight years. Prior to his testimony in this case, he visited several of Debtor's operations and examined financial statements and other documents relating to Debtor's financial position during the relevant period. He reviewed the aging of accounts receivable prepared by Mr. Wisniewski to ascertain the percentage discounts that had been applied to the various categories of receivables. In addition, he examined Debtor's physical inventory records and inspected the merchandise actually stocked in Debtor's Wabash Avenue warehouse. Mr. Urgo testified that he had also attended, as a customer, several of the liquidation sales conducted by Debtor at stores scheduled for closing.

Based upon his examination of Debtor's operations, Mr. Urgo stated that in his opinion the amounts testified to by Mr. Wisniewski, concerning the fair market value and liquidation value of Debtor's assets at the relevant dates, were reasonable.

The Court Concludes and Further Finds:

1. In a proceeding to avoid a preferential transfer, the trustee or debtor-in-possession has the burden of proving by a preponderance of the evidence each of the elements prescribed in § 547(b) of the Bankruptcy Code. *See Constructora Maza, Inc. v. Banco de Ponce*, 616 F.2d 573, 576 (1st Cir. 1980). § 547(f) of the Bankruptcy Code provides as follows:

"(f) For the purposes of this section, the debtor is presumed to have been insolvent on and during the 90 days immediately preceding the date of the filing of the petition."

Upon the hearing, this Court ruled that Defendants had rebutted the presumption of insolvency created by § 547(f). The burden at all times remained upon Plaintiff to

prove the elements of a preference by a preponderance of the evidence. Fed.R. Evid. 301.

■ 2. § 101(26) of the Bankruptcy Code provides in pertinent part as follows:

"(26) 'insolvent' means—

(A) with reference to an entity other than a partnership, financial condition such that the sum of such entity's debts is greater than all of such entity's property, at a fair valuation, exclusive of—

(i) property transferred, concealed, or removed with intent to hinder, delay, or defraud such entity's creditors; and

(ii) property that may be exempted from property of the estate under section 522 of this title; ...

. . . ."

"Fair valuation" has been interpreted generally to mean the amount which can be realized from the assets within a reasonable time. *See American National Bank and Trust Company of Chicago, Illinois v. Bone,* 333 F.2d 984, 987 (8th Cir. 1964); *In re Studebaker Corp.,* 9 F.Supp. 426, 427 (N.D. Ind.1935). Unless a business is on its deathbed, *see Langham, Langstrom & Burnett v. Blanchard,* 246 F.2d 529, 532 (5th Cir. 1957); *In re Fred D. Jones Co.,* 268 F. 818 (7th Cir. 1920); *In re Windor Industries Inc.,* 459 F.Supp. 270, 276 (N.D.Tex.1978), the "fair value" of its assets, within the meaning and purview of § 547(b) of the Bankruptcy Code, is the going concern value or fair market price. *See Edward R. Bacon Co. v. Grover,* 420 F.2d 678, 679 (9th Cir. 1970); *American National Bank and Trust Company of Chicago, Illinois v. Bone, supra* at 987; *J. W. Butler Paper Co. et al. v. Goembel,* 143 F. 295, 297 (7th Cir. 1905).

■ 3. Based upon the testimony concerning fair market value, and excluding from the book values listed in Plaintiff's Exhibit No. 1 all assets and liabilities attributable to entities other than Debtor, the balance sheet at December 31, 1979 and March 28, 1980 would appear as follows: [3]

### UTILITY STATIONERY STORES, INC.
### SUMMARY OF ASSETS AND LIABILITIES

|  | December 31, 1979 (Unadjusted) Per Books | December 31, 1979 Fair market value | March 28, 1980 (Unadjusted) Per Books | March 28, 1980 Fair market value |
|---|---|---|---|---|
| Cash | $ (15,515) | $ --0-- | $ --0-- | $ --0-- |
| Accounts Receivable | 329,340 | 264,000 | 179,649 | 107,000 |
| Inventory | 757,834 | 500,000 | 427,000 | 330,000 |
| All other assets | 150,143 | 120,000 | 130,000 | 120,000 |
| Total | $1,221,802 | $ 884,000 | $ 736,649 | $ 557,000 |
| Liabilities | $1,328,977 | $1,328,977 | $1,320,573 | $1,320,573 |
| Excess of liabilities over assets | $ 107,175 | $ 444,977 | $ 583,924 | $ 763,573 |

[March 28, 1980, cont.]

Detail of Liabilities –

| | | | | |
|---|---|---|---|---|
| Secured | $ 269,612 | | Unsecured | $ 971,952 |
| Priority Claims | 79,009 | | Total | |
| | $ 348,621 | | Liabilities | $1,320,573 |

**3.** Excluded from the December 31, 1979 figures are: Hallin inventory, $57,500; Hallin liabilities, totalling $152,869; and JMPH obligations, $164,400. Excluded from the March 28, 1980 figures are: Hallin's secured debt, $57,500; Utility Supply Company's obligation to Miles Management, $11,010; and JMPH obligations, $164,400.

4. Defendants contend that the fair market value placed upon Debtor's inventory is too low, partly because of the deduction of $97,000.00 for obsolete inventory acquired from Hallin. They argue that Debtor may have had a right of return on some of these goods and that deduction of the entire book value amount is unreasonable. However, since these items had been on hand for at least two years, they should not be accorded a fair market value in excess of $50,000.00.

Defendants further contend that in reducing the book value of inventory at December 31, 1979 by $170,000.00, which represents inventory shrinkage for the year ended March 28, 1980, Mr. Wisniewski attributed none of the losses to the period after December 31, 1979. Defendants' contention is well taken. Mr. Wisniewski testified that the figure represented a "continuing loss", similar to that recorded in previous years. Consequently, it may be assumed that approximately 25% of these losses were incurred after December 31, 1979, and the inventory figure should have been reduced in this regard by only $127,500.00. With these adjustments, the Court finds that the fair market value of Debtor's inventory at December 28, 1979 was $583,334.00, and the fair market value of Debtor's inventory at March 28, 1980 was $380,000.00.

In this connection, it should be noted that, after a reduction for shrinkage and a partial reduction for inventory acquired from Hallin, Debtor's merchandise has been given its full book value. Defendants strenuously urge that no consideration has been given to the going concern value of any stores in Debtor's chain. In light of Debtor's heavy operating losses during the fiscal year ended March 31, 1980 and of the substantial deficit existing at that time, it is questionable whether Debtor's assets possessed much in the way of going concern value. However, to the extent that they do, this value is amply reflected for inventory by giving it, with limited exceptions, its full book value.

5. It is contended that Debtor's accounts receivable are understated because of a failure to include intercompany claims. With regard to Hallin, any payments made to its creditors after the consolidation of the businesses in September or October of 1979 would have been made by Debtor. During this period, Hallin's secured loan with Sears Bank and Trust Company was reduced by $7,500.00, and the interest on the loan, at two over prime, was kept current. The statement of affairs filed on behalf of Hallin indicates that a $20,000.00 note to Bertrand Hallin was paid in full in October, 1979. Additionally, Hallin invoices were paid by Debtor after the consolidation, although there is little evidence as to the magnitude of these payments. Mr. Wisniewski testified that any payments made would have been less than $1,000.00. It is therefore doubtful whether these payments would have exceeded, in the aggregate, $20,000.00, since no merchandise was ordered under the Hallin name after September of 1979.

Assuming interest on Hallin's secured loan amounted to approximately $1,000.00 per month, Debtor's claim against Hallin on account of the above transactions would be approximately $43,000.00 at December 31, 1979 and $53,500.00 at March 28, 1980.

With regard to JMPH, Debtor would have a claim for reimbursement of the $12,000.00 paid pursuant to the consulting agreement with Bertrand H. Hallin and for the $15,600.00 paid to Mr. Hallin on behalf of JMPH in connection with the closing of the stock purchase transaction. The total claim against JMPH would be $27,600.00 at both December 31, 1979 and March 28, 1980.

6. The book value for "all other assets" at December 31, 1979 should be increased by $40,000.00, representing the value of leasehold improvements written off Debtor's books prior to termination of the leases.

7. Defendants' contention that the cash figure at December 31, 1979 fails to make a proper accounting for monies received on that date is without merit. Though there was some conflict in the testimony, the Court finds that the balance sheet at December 31, 1979 contained in Plaintiff's Exhibit No. 1 was prepared from Debtor's bank reconciliation, which would have included deposits in transit.

8. Adjusting Debtor's balance sheet at December 31, 1979 and March 28, 1980 to reflect the leasehold improvements, the intercompany claims, and the higher valuation of inventory, and accepting both the leasehold improvements and the intercompany claims at face value, Debtor's assets still fall short of its liabilities by $251,000.00 at December 28, 1979 and $592,000.00 at March 28, 1980.

Additional financial statements presented to the Court further support these findings. Balance sheets as of December, 1978, January 31, 1979, and March 31, 1979 were offered and received into evidence as Plaintiff's Exhibits Nos. A, B, and C, respectively, and establish Debtor's net worth ranging from a positive $190,435.00 to a negative $153,804.00. If no consideration is given to negative goodwill, the net worth shown in these balance sheets would range from a positive $457,102.00 in December of 1978 to a positive $49,343.00 in March of 1979. The Court finds these figures not inconsistent with the findings made above concerning Debtor's net worth at December 31, 1979 and March 28, 1980, inasmuch as Debtor sustained a loss of approximately half a million dollars for the year ended December 31, 1979.

Additional balance sheets as of January, 1979, March 31, 1979, and September 30, 1979 were offered and received into evidence as part of financial statements, Defendants' Exhibits Nos. D, C, and G, respectively, and show Debtor's net worth ranging from a positive $150,000.00 in January, 1979 to a negative $200,000.00 in September, 1979.[4] If no consideration is given to negative goodwill, the net worth ranges from a positive $500,000.00 in January of 1979 [5] to a positive $83,000.00 in September of 1979. Again, in light of Debtor's heavy operating losses for the fiscal year ended March 31, 1980, the Court finds these figures not inconsistent with the findings made above.

Another balance sheet as of December 31, 1979, offered and received into evidence as Defendants' Exhibit No. B, shows Debtor's net worth as a negative $582,181.00. However, if no consideration is given to negative goodwill or to the JMPH purchase obligation of $99,400.00 listed as a liability on Defendants' Exhibit No. B, the net worth at December 31, 1979 is a negative $202,724.00. This figure is consistent with the Court's finding made above that Debtor's liabilities at December 28, 1979 exceeded its assets at book value by $107,175.00; indeed, the figure indicates that an even greater deficit may have existed.

One final balance sheet, dated November 29, 1979 and offered and received into evidence as Defendants' Exhibit No. E, shows a net worth of $485,000.00. This balance sheet is contained in a Dun & Bradstreet report dated December 10, 1979. Defendants called as a witness the Dun & Bradstreet employee who testified that she prepared the exhibit from information obtained during a telephone conversation with Mr. Wisniewski. Mr. Wisniewski testified that he remembered having such a conversation, but that he did not give an estimate of the accounts payable as $400,000.00 as indicated in Defendants' Exhibit No. E. He stated that the figure would have been much higher and that the amount shown was erroneously noted by the Dun & Bradstreet representative and improperly in the aforesaid balance sheet.

In light of the overwhelming evidence of insolvency, the Court can only assume that the accounts payable figure in the aforesaid exhibit was in error. However, the figure may be relevant to the question of estoppel, and the Court makes no findings concerning that issue at this time.

9. The excess of Debtor's liabilities over its assets represents approximately 23% of total assets at December 31, 1979 and 81% of total assets at March 28, 1980. To overcome such large shortfalls, it would be nec-

---

4. The balance sheet contained in Defendants' Exhibit No. G is a consolidated balance sheet for both Debtor and Hallin.

5. Mr. Wisniewski testified that the asset listed as negative $350,000.00 on Defendants' Exhibit No. D, "Purchase Discounts", represents what was later carried as negative goodwill.

essary to make adjustments in valuation of inventory and further inclusion of additional assets to an extent that would be beyond reason and totally unjustified under the circumstances of this case. Credulity has probably been overreached already by inclusion of intercompany claims at face value. Both JMPH and Hallin are debtors in related chapter 11 proceedings, and after application of principles of equitable subordination, the obligations owing by JMPH and Hallin would probably have no value.

10. Debtor was insolvent within the meaning and purview of § 547(b) of the Bankruptcy Code at all times during the ninety days preceding the filing of the petition herein.

11. The trustee or debtor-in-possession, in addition to proving insolvency at the time of the transfer, must prove that the transfer will enable the creditor to receive more than such creditor would receive in a chapter 7 liquidation but for the transfer.

Defendants are general unsecured creditors, and their claims would be subordinate, in a case under chapter 7, to those of secured creditors and creditors holding claims having priority under the applicable provisions of the Bankruptcy Code. Secured and priority claims against Debtor amount to a total of $348,621.00.

The liquidation value of Debtor's assets at March 28, 1980, as testified to by Mr. Wisniewski and Mr. Urgo, amounts to a total of $205,000.00. The Court finds that these figures are reasonable. However, assuming an additional 15% return on liquidating Debtor's inventory and $30,000.00 more for the leasehold interests, Debtor's assets, including the amounts which are the subject of these proceedings, would still be insufficient to pay its secured and priority claims in full. If expenses of administration are considered, the deficiency is even greater. Creditors holding unsecured claims against Debtor would have received nothing if the case had been filed under chapter 7, the transfers had not been made, and the creditors received payment to the extent provided by the distributive provisions of the Bankruptcy Code.

Unless the assets in this case were sufficient to provide in liquidation a 100% distribution to the unsecured creditors, any creditor holding an unsecured claim who received a partial payment during the ninety day preference period would be in a position to receive more than he would have received in a chapter 7 liquidation. Justice Brandeis explained in *Palmer Clay Products Co. v. Brown*, 297 U.S. 227, 229, 56 S.Ct. 450, 450, 80 L.Ed. 655 (1936):

"The payment on account of say 10% within the four months will necessarily result in such creditor receiving a greater percentage than other creditors, if the distribution in bankruptcy is less than 100%. For where the creditor's claim is $10,000, the payment on account $1000, and the distribution in bankruptcy 50%, the creditor to whom the payment on account is made receives $5500, while another creditor to whom the same amount was owing and no payment on account was made will receive only $5000."

By no stretch of the imagination would Debtor's unsecured creditors have received a 100% distribution in a case under chapter 7.

12. The payments which are the subject of these proceedings enabled the Defendants to receive more than they would have received if the case were a case under chapter 7 of title 11 of the United States Code, the payments had not been made, and the Defendants received payment of their debts to the extent provided by the provisions of the Bankruptcy Code.

IT IS THEREFORE ORDERED that a status hearing on remaining issues be held and that a status hearing be, and the same is hereby set for May 21, 1981, at 11:00 a. m.