In re FLAGSTAFF FOODSERVICE
CORP., et al., Debtors.

ALLSTATE FABRICATORS
CORP., Plaintiff,

v.

FLAGSTAFF FOODSERVICE CORP.
and General Electric Credit
Corporation, Defendants.

Bankruptcy Nos. 81 B 11430(PBA) to
81 B 11436(PBA).
Adv. No. 82–6286–A.

United States Bankruptcy Court,
S.D. New York.

Jan. 14, 1986.

Robert Herzog, New York City (Robert P. Herzog and John Pereira, of counsel), and Marshall G. Kaplan, Brooklyn, N.Y., co-counsel, for Allstate Fabricators Corp.

Levin, Weintraub & Crames, New York City (Mitchell Perkiel and Vincent Torna, of counsel), for debtors.

Raff, Scheider & Wiener, Newark, N.J. (Jeremy Galton, of counsel), for Gen. Elec. Credit Corp.

Robert Fisher, Fisher, Hecht & Fisher, New York City, Trustee.

PRUDENCE B. ABRAM, Bankruptcy Judge:

On October 21, 1982, Allstate Fabricators Corp. (hereinafter "Allstate") commenced this adversary proceeding against Flagstaff Foodservice Corp. ("Foodservice"), then a Chapter 11 debtor. Subsequently, on June 28, 1984, an order was signed converting the cases to Chapter 7 and a Chapter 7 trustee thereafter appointed.

The complaint has three counts: Count I seeks to reclaim certain kitchen equipment (the "Equipment") having an invoice price of $29,287 delivered to the debtor on July 14, 1981 in reliance on Uniform Commercial Code ("UCC") § 2–702 and Bankruptcy Code § 546(c); Count II seeks to recover the Equipment or its value on the theory that the goods were received by the debtor with an intent to defraud Allstate; and Count III seeks reimbursement for attorney's fees pursuant to Section 276–a of the New York Debtor-Creditor Law. On December 21, 1982, an amended complaint was filed adding General Electric Credit Corporation ("GECC") as a defendant because GECC as a secured creditor might claim an interest in the Equipment or its value or the account receivable generated by Flagstaff's sale of the Equipment.

Foodservice's answer denies the material allegations of the amended complaint and avers that Counts II and III fail to state a claim upon which relief can be granted. The answer further states that at the time of the receipt of the reclamation demand, the Equipment had already been sold and shipped to a customer and that, absent possession of the goods, Counts I and II must be denied. GECC also filed an answer. GECC's answer asserts five separate defenses: 1) Counts II and III fail to state a claim upon which relief can be granted; 2) Foodservice was not insolvent at the time of receipt of the Equipment or of the reclamation demand; 3) the Equipment had been sold and shipped to a customer by the time reclamation demand was made; 4) proper and timely demand was not made; and 5) any money judgment under Count III would not have priority in payment over GECC by virtue of the order of the bankruptcy court dated July 29, 1981 approving a financing agreement with GECC.

A trial was held on June 14 and 23, 1983 at which time the court heard testimony from two witnesses and a number of documents were received in evidence. Although the parties were directed to submit a pretrial order, no order was agreed upon as GECC objected to virtually all of the proposed facts. The supposed disputes have been generally resolved in favor of Allstate in the court's findings; notwithstanding this, the court's legal conclusions favor GECC. The effect of the contentiousness on factual matters, which should have been unnecessary, has been to force the court to consider and resolve the numerous small legal points raised which will have collateral (and generally adverse to GECC) effect on GECC's pending motion for reconsideration of several other previously allowed reclamation claims. See Footnote 2.

Based on its findings of fact, the court concludes that Count I fails to state a claim on which relief may be granted. Allstate's reclamation demand under § 546 fails because, although proper and timely demand was made and insolvency existed, the Equipment was not shown to have been on hand at the time reclamation was sought. Count II also fails to state a claim for relief because GECC's pre- and post-petition security interests in accounts receivable, including the proceeds of the sale of the

Equipment, are superior to the claim to the proceeds made by Allstate, a seller who did not retain a purchase money security interest. As Counts I and II fail, Count III must necessarily fail.

The facts are as follows: on July 21, 1981, Foodservice and six of its subsidiaries (collectively "Flagstaff") filed petitions for reorganization under Chapter 11 of the Bankruptcy Code.[1] At the time of the filings, Flagstaff was actively engaged in the institutional food service and distribution business. One of the filing subsidiaries, Flagstaff Foodservice Co. of New England, Inc. ("Flagstaff-New England") operated a food distribution business in the New England area from premises located at One Venus Way, Attleboro, Massachusetts. Another subsidiary, Flagstaff Foods Corp. ("Foods") had a warehouse and distribution center at 536 Fayette Street, Perth Amboy, New Jersey.

At the time the Chapter 11 petitions were filed, GECC held security interests in all of Flagstaff's inventory and accounts receivable, as well as substantially all other assets of the debtors, as a result of a loan agreement entered into on November 29, 1978. The outstanding prepetition indebtedness to GECC was approximately $22 million. Each of the debtors was jointly and severally liable to GECC for this amount. On or about July 21, 1981, Flagstaff obtained a court order authorizing an emergency borrowing arrangement with GECC. On July 29, 1981, the bankruptcy court approved an order authorizing the debtors in possession to borrow from GECC on a secured basis and granting to GECC a super-priority status. Although the order originally submitted would have granted GECC a lien superior to any prior or later lien, the court amended the order to provide that GECC's super-priority status was subject to the following:

> "Except for administration claims fixed by court order pursuant to § 546(c)(2) of the [Bankruptcy] Code to which GECC liens and administration claims shall be subordinate."

The July 29 GECC financing order and reclamation demands by other entities in this case have been the subject of several decisions and familiarity with the earlier decisions will be presumed. See *In re Flagstaff Foodservice Corporation (McCain Foods, Inc. v. Flagstaff Foodservice Company New England, Inc.)*, 14 B.R. 462 (Bktcy.S.D.N.Y.1981) (Seller of frozen french filed potatoes entitled to reclamation under Code § 546 only to extent that the foodstuffs were in debtor's possession on date of seller's demand for reclamation); *In re Flagstaff Foodservice Corporation (General Electric Credit Corp. v. Levin & Weintraub, et al.)*, 739 F.2d 73 (2d Cir.1984) (Flagstaff I) (Attorneys not entitled to payment from GECC's collateral because services were not for the benefit of GECC); *In re Flagstaff Foodservice Corporation (General Electric Credit Corporation v. Peltz, et al.)*, 762 F.2d 10 (2d Cir.1985) (Flagstaff II), *reversing* district court's affirmance of 29 B.R. 215 (Bankr.S.D.N.Y.1983) (GECC's superpriority security interest would not be subordinated to outstanding payroll taxes incurred during Chapter 11 absent proof of direct benefits received by GECC or GECC's consent); and *In re Flagstaff Foodservice Corp.*, 32 B.R. 820 (Bankr.N.Y.1983) (court denied motion to vacate orders allowing reclamation claims and permitted GECC to move for reconsideration of certain order allowing reclamation claims).[2]

1. By order signed July 21, 1981, the following debtors were consolidated for procedural purposes:
   —Flagstaff Foodservice Corporation,
   —Flagstaff Foodservice Co. of New England, Inc.,
   —Flagstaff Foodservice Co. of Connecticut, Inc.,
   —Flagstaff Foods Corp.,
   —Flagstaff International, Inc.,
   —Marlboro Freezers, Inc., and
   —A. Peltz & Sons, Inc.

2. In October, 1983, GECC filed a motion specifying legal and factual objections to a number of the allowed reclamation claims. Concurrently herewith the court is issuing its decision on GECC's motion.

The reclaiming creditor in this adversary proceeding, Allstate, is in the business of fabricating kitchen equipment. The Equipment Allstate is seeking to reclaim was specially fabricated to order for a Flagstaff customer. At trial, it was asserted that there is some uncertainty about which one of the Flagstaff entities was the buyer. Allstate's invoice for the Equipment is addressed to "Flagstaff Foodservice Co., One Venus Way, Attleboro, Massachusetts 02703". There is no entity in the Flagstaff group bearing that exact name. The proper legal name of the corporation using that address was Flagstaff Foodservice Co. *of New England, Inc.* The parent company was Flagstaff Foodservice Corporation, not *Co.* The invoices sent by the debtors seeking payment from Flagstaff's customer are on a printed form captioned "Flagstaff Foodservice Co. New England Division" and give the Attleboro address. The bottom of the invoice reads "Hartford Division —24 East Newberry Road, Bloomfield, Connecticut * * * Metropolitan New York Division—Flagstaff Foods Corp.—Perth Amboy, N.J." The check ultimately received in payment of the invoices was payable to "Flagstaff". The court finds that Allstate intended to deal with Flagstaff-New England and that Flagstaff-New England intended to be and was the buyer of the Equipment.

Mary Casey, bookkeeper and office manager for Allstate testified that on July 14, 1981, the Equipment was picked up from the Allstate premises by an independent trucker hired by Flagstaff. Although Allstate had indicated in its pretrial order that it would call a representative of the trucking company as a witness, no such witness testified at trial. The Allstate purchase order signed by the trucker when picking up the goods offers scant help in ascertaining the first destination of the goods. The Flagstaff-New England Attleboro address appears at the top of the purchase order, which also states that the crates were "marked for: Schuwayer Worker's Camp." Attleboro, Massachusetts; Perth Amboy, New Jersey; and Newark, New Jersey, the three probable destinations of the equipment, are all less than a day's drive from Allstate's facilities in Rhode Island. The bills of lading were not introduced at trial.

After the Equipment was picked up, Mrs. Casey received a telephone call from a Flagstaff sales representative who informed her that Flagstaff was going into a Chapter 11 proceeding. Although Mrs. Casey testified this conversation occurred on July 17, which was 4 days before the Chapter 11 petitions were filed, the court is of the view that the conversation occurred on July 21, the day the petitions were filed, and the day a reclamation telegram was sent by Allstate. Whether the date was July 17 or July 21 is of no significance to the outcome of this case. At the time of the telephone call, she was also informed that the firm of Levin & Weintraub (now known as Levin & Weintraub & Crames) ("L & W") was acting as counsel to Flagstaff. Upon learning the foregoing, Mrs. Casey caused to be sent to L & W, a Western Union telegram demanding reclamation of the Equipment pursuant to Section 2–702 of the Uniform Commercial Code. On July 22, 1981 Allstate received from Western Union a confirmation copy of the telegram in the form of a mailgram. On July 25, 1981, Western Union sent Allstate a further mailgram which stated "The telegram you sent to the above addressee was delivered at the time and date indicated above." A photocopy of the telegram received by L & W was introduced at trial and it bears a date stamp "JUL 27 1981." No one testified at trial as to how or why or when this date stamp came to be placed on the document.

On July 27, 1981, L & W sent a letter to Allstate. The letter states that it is returning Allstate's invoices and advises that "in order to retain said merchandise, you must send a telegram directly to the debtor", although it does not provide any address for the debtor. Allstate received the L & W letter on July 29, 1981.

Some eleven months later and on June 18, 1982, Allstate followed up on its demand by sending a letter to L & W inquiring as to the status of its claim. L & W

promptly contacted Flagstaff regarding this inquiry. Robert Ronnenberg, vice-president and controller for Flagstaff at that time, informed L & W in a letter dated July 1, 1982, that the merchandise purchased from Allstate was sent to Flagstaff's customer as soon as it was received, and that it was not on hand at the time the 2–702 demand was made. Mr. Ronnenberg appeared at the continuation of the trial on June 23, 1983 to testify regarding his investigation of the Allstate claim. Mr. Ronnenberg was in charge of the investigations made by Flagstaff of the numerous reclamation demands received. He stated that although he had no present recollection of the Allstate reclamation demand that he would not have sent the July 1, 1982 letter to L & W except after completing an investigation of the Allstate claim and being satisfied as to the matter. Flagstaff's records have apparently been lost since that investigation, and thus were not available at trial. Mr. Ronnenberg was unable to testify with certainty as to whether in this case the Equipment were drop-shipped to Flagstaff's customer or whether it was brought first to a Flagstaff plant for inspection and then repackaged for delivery to the customer. Mr. Ronnenberg was able to testify, however, that an item that was custom made for a specific customer was normally inspected and delivered as quickly as possible, as Flagstaff would not get paid until after shipment. Transcript at 108, 115.

The Equipment was billed on six Flagstaff invoices aggregating $44,822 addressed to International Services & Design Ltd., 353 Dwight Street, Springfield, Massachusetts. International Services & Design Ltd. was the representative or agent for the ultimate customer, Abdullah Al-Hamond Al-Shuwayer of Saudia Arabia. Three of the six invoices totalling $10,276 are dated July 20, 1981; the remaining three, aggregating $34,546 are dated August 6, 1981. Attached to the invoices as introduced at trial are what were apparently internal forms of some sort used by Flagstaff. These forms are rubber stamped with Flagstaff's name and the Perth Amboy address at the top and in the "Ship to" box appears "Shuwayer Worker's Camp & World Systems Whse., 320 Elizabeth Avenue, Newark, New Jersey." These forms also list an item description and number, and a dimension, cube, gross weight and box number.

Mr. Ronnenberg testified that a customer invoice would not be prepared and sent until the merchandise was delivered to a customer. He further testified that normally the invoices would be prepared promptly upon advice of delivery to the customer. Thus, the three July 20, 1981 invoices are evidence that Flagstaff did not have that part of the Equipment on hand when the July 21 reclamation telegram was sent. However, a contrary implication cannot be drawn with respect to the August 6 invoices. The filing of the Chapter 11 petitions on July 21 would necessarily have disrupted the normal procedures for some period of time due to employee confusion, increased telephone inquiries and the need for personnel to be directed to matters respecting the Chapter 11 filings. Based on the documents, Mr. Ronnenberg's testimony of customary practices and his investigations, the court finds that the Equipment was delivered to the Foodservice Perth Amboy facility, repackaged there and delivered to Shuwayer's Newark warehouse, a distance of only a few miles, no later than July 20, 1981.

At trial, GECC's counsel made much of apparent discrepancies between the descriptions of the Equipment in Allstate's invoices and that in Flagstaff's invoices. The court finds that all of the Equipment referred to in the Allstate invoices is covered by the Flagstaff invoices and that any variations in description are without substantive meaning. The Equipment was ultimately received by Shuwayer in Saudi Arabia, although it is unclear as to when, as in January 1982 Flagstaff received a check from Reinhard & Associates, Inc., in the amount of $78,119.46, a portion of which represented payment of the six invoices.

At the continuation of the trial, this court also heard testimony from Mr. Ronnenberg regarding the solvency of the seven debtor corporations at the time of the reclamation demand. Mr. Ronnenberg is a certified public accountant licensed to practice in New York, who, until shortly before the trial, was acting in the capacity of chief financial officer of Flagstaff. Mr. Ronnenberg testified that the schedules for the debtor corporations were prepared under his supervision, and that they represented the assets as of the filing date of each at book value. These assets consisted of trade receivables, inventory, liquid funds, real estate and leasehold interests and equipment and fixtures used in the food service industry. The schedules list the total assets of the seven corporations at $32,048,314.86,[3] and the total liabilities at $43,339,729.95. The schedules list the assets and liabilities of Flagstaff-New England, the actual purchaser of the Equipment, at $14,087,818.23 and $8,589,225.74, respectively, thus creating the appearance of a substantial shareholders' equity. However the scheduled liabilities of Flagstaff-New England do not include the $20,684,768.61 liability to GECC. If the liability to GECC is added, none of the debtor corporations has an excess of assets over liabilities. Although the 1978 Security Agreement between Flagstaff and GECC required the guarantee of each of the seven debtor corporations, this obligation is listed only on the books of the parent company, Foodservice.

Mr. Ronnenberg testified as to the unsuccessful debtor-in-possession operations of the seven companies. Unable to sustain heavy losses, three of the seven debtors, including Foodservice, ceased operations by the middle of August of 1981, less than one month after the filing of the petitions. The Connecticut plant closed down in February of 1982. Marlboro Freezers and A. Peltz & Sons closed in March 1982, and thereafter the property of the two was sold for $1,050,000. Flagstaff-New England, ceased operations in March of 1982. Its assets, along with those of the Connecticut and Perth Amboy subsidiaries, were sold at auction for under one million dollars. Receivables due to all of the operations have not been fully collected.

## DISCUSSION

Section 546(c) of the Bankruptcy Code expressly deals with the rights of a seller who delivers goods to a buyer and then attempts to reclaim them after the buyer goes into bankruptcy. This section provides that:

"The rights and powers of the trustee under sections 544(a), 545, 547, and 549 of this title are subject to any statutory right or common-law right of a seller, in the ordinary course of such seller's business, of goods to the debtor to reclaim such goods if the debtor has received such goods while insolvent, but—

(1) such a seller may not reclaim any such goods unless such seller demands

---

3. No value has been assigned in the debtor's schedules to a lawsuit commenced by several of them during the Chapter 11 case against Consolidated Foods Corporation and PYA/Monarch claiming a breach by defendants of a contract to purchase the Flagstaff-New England operation and seeking damages as a result of defendants' hiring of 11 of Flagstaff's salesmen after the Chapter 11 cases were commenced. For a description of this litigation, see *In re Flagstaff Foodservice Corporation (Flagstaff Foodservice Corporation, et al. v. Consolidated Foods Corporation, et al.)*, 25 B.R. 844 (Bankr.S.D.N.Y.1982). On July 3, 1985, this court signed an order authorizing the Chapter 7 Trustee to settle the Consolidated Foods adversary proceeding for $125,000. GECC, who did not object to the settlement which was approved only after notice was given to all creditors, has objected to any allowance to special counsel for prosecuting the action, and asserted that it has a superior claim to the entirety of the settlement fund. That dispute is presently before the court for resolution.

The court does not dispute the fact that choses in action, although difficult to value are nonetheless assets of the estate. *In the Matter of Smith*, 640 F.2d 888 (7th Cir.1981). However, in the instant case, the chose in action arose during the Chapter 11 cases and is therefore irrelevant for purposes of this reclamation proceeding as insolvency is to be determined on the date the goods were received, Code § 546(c), which was prior to the time the case of action arose.

in writing reclamation of such goods before ten days after receipt of such goods by the debtor; and

(2) the court may deny reclamation to a seller with such a right of reclamation that has made such a demand only if court—

(A) grants the claim of such a seller priority as an administrative expense; or

(B) secures such claim by a lien."

Code § 546(c) permits a seller to reclaim goods sold to a debtor under certain conditions. These conditions are generally: (1) the seller has a common-law or statutory right to reclaim the goods; (2) the debtor received the goods while insolvent; and (3) the seller makes written demand within ten days after receipt of goods by debtor. Additionally this section permits a court to deny reclamation if said court either grants priority to the claim as an administrative expense or secures the claim by a lien.

In this case, the first condition is met because Section 2–702 of the Uniform Commercial Code provides a statutory right of reclamation. The second condition is that the debtor was insolvent when it received the goods. GECC argues that Flagstaff was not insolvent at the time it received the goods and thus this condition has not been satisfied. The court disagrees.

The term insolvency is not separately defined in Code § 546. The definitional section of the Bankruptcy Code, Section 101, defines the term insolvency as follows:

" 'insolvent' means—

(A) with reference to an entity other than a partnership, financial condition such that the sum of such entity's debts is greater than all of such entity's property, at a fair valuation, exclusive of—

(i) property transferred, concealed, or removed with intent to hinder, delay, or defraud such entity's creditors; and

(ii) property that may be exempted from property of the estate under section 522 of this title...."

11 U.S.C. § 101(26).

■ The definitional sections, absent a clear indication to the contrary, are applicable to all provisions of the Bankruptcy Code. Accordingly, the question of insolvency is to be determined by the test enunciated in Section 101(26).[4] See also *In re Furniture Distributors, Inc.,* 45 B.R. 38 (Bankr.D.Mass.1984).

The starting point in determining the issue of insolvency must necessarily be the statutory requirement of fair valuation. GECC has questioned Flagstaff's method of valuation in computing its assets and liabilities on its schedules and it is GECC's position that the schedules do not reflect "fair valuation" of the assets and liabilities of the debtor corporations. Fair valuation, as that term is used in the Bankruptcy Code, depends upon many factors. There is no one formula to be applied in determining what is fair valuation. The operative factors will vary depending upon the particular facts and circumstances. As was recently stated by the First Circuit Court of Appeals, "[t]he determination of the 'fair valuation' of the debtor's assets at a specific time is at best an inexact science, and may often be impossible." *Construction Maza, Inc. v. Banco de Ponce,* 616 F.2d 573, 577 (1st Cir.1980).

Generally speaking, there are two types of values that can be assigned to the assets of a business. There is the "going concern" value or the "historical" or "book" value. The basic problem of valuation is determining whether a business should be treated as a going concern rather than on an item by item basis. *See generally,* 2 Collier on Bankruptcy ¶ 101.26 at 101–54[4] *et seq.* (15th ed. 1982). Determinations made on a going concern analysis will generally result in a higher valuation as an active enterprise is usually worth more

---

**4.** Use of the balance sheet test for insolvency pursuant to the Bankruptcy Code does not conflict with the test provided for under the Uniform Commercial Code, as Section 1–201(23) of the U.C.C. provides for the balance sheet test as one of three methods of determining insolvency.

than the sum of its parts. However, going concern value should not be used where the debtor is "financially dead or mortally wounded." *In re Fred D. Jones Co.*, 268 F. 818, 819 (7th Cir.1920). As stated in *Matter of Randall Const., Inc.*, 20 B.R. 179, 184 (N.D.Ohio 1981) "the fact that a company is nominally in existence is not persuasive in valuing the company at a 'going concern' valuation."

■ Although being administered under Chapter 11 at the time of the trial, these cases were indisputably in a liquidating posture. The assets of the corporations were gradually being liquidated, and it was apparent that administration creditors will not be paid in full. Suffice it to say, a "going concern" will not emerge from these proceedings. Based on the history of the cases and their postures at the time of trial, the court finds that valuation based on a going concern value at the time the reclamation demand was made would not be an accurate portrayal of the financial condition of the debtors. This being the case, valuation based on historical cost, or book value is appropriate. *See Langham, Langston & Burnett v. Blanchard*, 246 F.2d 529 (5th Cir.1957); *Matter of Randall Const., Inc.*, 20 B.R. 179, 184–85 (N.D.Ohio 1981); *In re Utility Stationery Stores*, 12 B.R. 170, 176 (Bankr.Ct.N.D.Ill.1981); *cf., Robinson v. Watts Detective Agency*, 685 F.2d 729, 735 (1st Cir.1982) (a company that continues to operate, albeit in serious financial condition, may still be evaluated as a going concern).

It is undeniable that the Flagstaff group as a whole is insolvent under the Code § 101(26) definition; the sum of its debts exceeds the sum of its assets by $11,291,415.09. GECC argues, however, that the schedules filed indicate that Flagstaff of New England is not insolvent as stated assets exceed stated liabilities. The stated liabilities, however, fail to take into account any portion of the GECC loan. As a co-guarantor of the loan along with the other corporations, presumably this corporation

as well as the others received a benefit from the loan, and would be entitled to contribution from the other debtors for amounts paid back to GECC which exceed the amount of the loan that it received.

As no evidence has been presented as to the allocation of the loan proceeds among Flagstaff of New England and the other debtors, the court has addressed the issue on several theories. Analysis of the schedules indicates that if the court were to apply the total net equity of each of the debtor corporations, excluding the parent corporation, against the GECC liability, the GECC liability would exceed the net equities. This indicates that is it not possible for GECC to be paid in full no matter what the allocations were. Thus, even under this analysis, which excludes other liabilities of the parent corporation, the liability of GECC exceeds the net equity by approximately $5,500,000.

■ If the court were to attribute a pro-rata amount of the GECC loan to Flagstaff of New England, based on Flagstaff of New England's share of the total Flagstaff assets, the result would likewise be a finding of insolvency. Flagstaff of New England's assets in the amount of $14,087,818.23 represent approximately 44% of the total assets of the Flagstaff debtors. Attributing 44% of the GECC indebtedness, i.e., approximately $9,000,000, to Flagstaff of New England, results in that entity's liabilities exceeding $17,000,000, as compared with the $14,000,000 of assets. The court is not unmindful of the right of contribution from the other debtors. That such a right is an asset, although not necessarily at its face value, is not disputed. *Matter of Ollag Construction Equipment Corp.*, 578 F.2d 904 (2d Cir.1978), *Matter of Hemphill*, 18 B.R. 38 (Bankr.Ct.S.D.Iowa 1982). However, when the co-guarantors themselves are insolvent, the value of this right is questionable at best. Accordingly, there is no doubt that Flagstaff of New England was insolvent.[5]

5. In light of the court's conclusion that Flagstaff of New England, and the other debtor corpora-

tions were insolvent under the analysis discussed, the court need not decide whether the

This court recognizes that while the schedules filed by the debtor are probative evidence, they are not in and of themselves dispositive of the issue of insolvency. *Braunstein v. Massachusetts Bank and Trust Co.*, 443 F.2d 1281 (1st Cir.1971). *See also Construction Maza, Inc. v. Banco de Ponce*, 616 F.2d 573, 577 (1st Cir.1980) (reduction of the value of the assets may be appropriate where the form of the asset does not lend itself to be made available for payment within a reasonable time). In this case, however, the schedules are strong probative evidence that Flagstaff was insolvent on the date it received the goods from Allstate because no showing has been made that would warrant an inference that Flagstaff was solvent on July 14, 1981, when the Equipment was picked up, but became insolvent at sometime during the week thereafter and by the time the Chapter 11 petitions were filed July 21, 1981.

For the aforementioned reasons the court concludes that Flagstaff Foodservice of New England, as well as the other Flagstaff debtors were insolvent as that term is defined in Code § 101(26), at the time of Allstate's demand.

Code § 546(c) also requires that the seller make a written demand upon the debtor within ten days after receipt of the goods by the debtor. Here, GECC questions the legal sufficiency of a written demand made upon Flagstaff's attorneys, Levin & Weintraub & Crames. For purposes of a reclamation action this court finds nothing in either the case law or the language of Code § 546(c) which precludes the possibility of a written demand upon a debtor's attorney constituting a sufficient demand. When, as here, a layperson is put on notice that a company is in a bankruptcy proceeding, it is only natural that he deal with the debtor's bankruptcy attorneys, particularly as he is frequently advised that he is stayed from bringing any action directly against the debtor. *Compare, In re Production Steel, Inc.*, 21 B.R. 951 (Bankr.M.D.Tenn.1982) (reclamation demand does not violate the § 362 stay). Here, after learning from a Flagstaff representative that Levin & Weintraub & Crames was handling the bankruptcy matter, Allstate promptly made its reclamation demand upon these attorneys. The rule may be stated generally that, where a notice pertains to the transaction in which an attorney is acting for the client, the knowledge so obtained is imputed to the principal. The attorney is regarded as the designated agent for the client for that purpose. *Application of Savoy*, 232 N.Y.S.2d 396, 397 (Sup.Ct.1962); 3 N.Y.Jur.2d, *Agency and Independent Contractors*, § 263 (1980). In light of the foregoing, this court finds that the demand upon the debtor's attorneys, Levin & Weintraub & Crames, was an adequate demand.

This court also finds that Allstate's demand was timely. Receipt of the goods occurred on July 14. Allstate's demand would have been made within the 10-day requirement under Code § 546(c), as computed under Rule 9006(a) of the Bankruptcy Rules of Procedure.[6] *See In the Matter of Marin Motor Oil, Inc.*, 740 F.2d 220 (3rd Cir.1984) (if the demand is made in a commercially reasonable manner, it is sufficient if dispatched by seller within the 10-day period).

The final and crucial question presented in determining compliance with Code § 546

---

debtor corporations should be treated as a single entity for purposes of determining insolvency. *Cf. In re United Finance Corp.*, 104 F.2d 593 (7th Cir.1939) (treatment of two corporations as one entity for purpose of determining solvency was proper where various liabilities were treated as joint debts and business transactions were not otherwise separate and distinct).

**6.** Rule 9006(a) provides, in pertinent part, that: "In computing any period of time prescribed or allowed by these rules, by the local rules, by order of court, or by any applicable statute, the day of the act, event, or default from which the designated period of time begins to run shall not be included. The last day of the period so computed shall be included, unless it is a Saturday, a Sunday, or a legal holiday, in which event the period runs until the end of the next day which is not a Saturday, a Sunday, or a legal holiday." Using this method of calculation, Allstate had until July 24 to give notice.

.

relates to the location of the goods at the time demand was made upon Flagstaff. *See, In re Flagstaff Foodservice Corp.*, 14 B.R. 462 (Bankr.S.D.N.Y.1981) (seller recovered only for the portion of goods which were in the debtor's possession on the date of demand). *In re Bensar Company, Inc.*, 36 B.R. 699 (Bankr.S.D.Ohio 1984). Here Allstate shoulders the burden of proving that Flagstaff had in its possession the goods at the time demand was made.[7] Allstate's evidence must indicate that this critical fact on which its recovery depends is true, and not merely that it is possible it is so. *Crusto v. Amalgamated Clothing Workers*, 524 F.Supp. 130 (E.D.La.1981); *Dreijer v. Girod Motor Company*, 294 F.2d 549, 556 (5th Cir.1961). Moreover, testimony heard at trial regarding this disputed fact must be viewed in the light most favorable to GECC. *Edwin F. Armstrong & Company v. Ben Pearson, Incorporated*, 294 F.Supp. 163, 167 (E.D.Ark.1967).

Allstate has failed to present convincing evidence that the goods were in Flagstaff's possession at either the time of sending or receipt of the reclamation demand. Although it appears that the goods were sent to Perth Amboy before being delivered to Shuwayer's Work Camp in Newark, there has been no showing by Allstate that the goods were still on hand at either Attleboro or at the Perth Amboy plant on July 22, eight days after shipment from Providence and two days after a portion of the goods had been billed to Flagstaff's customer. Allstate's reclamation claim must be denied on the grounds that it has failed to prove that Flagstaff was in possession of the Equipment at the time of receipt of the reclamation demand.

■ This court now addresses the question of whether Allstate, having failed on its Code § 546(c) claim, can avail itself of a common law fraud remedy. It appears to be well settled law that Code § 546(c) is an exclusive remedy for reclaiming creditors. *See, In re HRT Industries*, 29 B.R. 861 (Bankr.S.D.N.Y.1983); *In re Deephouse Equipment Co.*, 22 B.R. 255 (Bankr.D. Conn.1982); *In re Koro Corp.*, 20 B.R. 241 (Bankr. 1st Cir.1982); *In re Ateco Equipment, Inc.*, 18 B.R. 917 (Bankr.W.D.Pa. 1982); *In re Contract Interiors, Inc.*, 14

---

7. It is clear that, as a practical matter, Code § 546(c) serves at least two purposes:

(1) Its requirement of a writing serves as evidence of a proper and timely demand and documents the seller's election to reclaim goods.

(2) It also provides the debtor with notice that a reclamation demand is being made and that goods which are sought to be reclaimed should not be disposed of in any way.

Just as these two purposes are separate and distinct, so must be their treatment be by the courts.

As an evidentiary matter a written demand, if sent in a commercially reasonable manner, is effective upon dispatch by the seller. Adopting such a "dispatch rule" furthers the generally desirable policy of certainty. This "notion of certainty relates not only to the simplification of evidentiary disputes, but also to minimizing the number and difficulty of disputes that will arise between the parties." *In the Matter of Marin Motor Oil, Inc.*, 740 F.2d 220, 228 (3d Cir.1983) (Adopting the dispatch rule for Section 546(c) reclamation cases).

Although the dispatch rule may not necessarily reduce the number of disputes, it will reduce their difficulty. Under the dispatch rule there will be very few disputes as to when the demand was sent. For example, demands made by Telex and telegram automatically record the time and date of their dispatch.

However, it cannot be said that a debtor is on notice of the reclamation demand upon its dispatch. It is well settled that the seller may only reclaim such goods actually on hand at the time of the demand. *In re Flagstaff, supra*, 14 B.R. 462; *In the Matter of Bensar Company, supra*, 36 B.R. 699. It would not be equitable to measure the amount of goods which may be recovered at the time of dispatch. It can hardly be said that the debtor is on notice of a demand at the time it is sent. Thus a seller may only reclaim such goods that remain in the debtor's possession at the time the debtor actually receives notice of the demand. This court need not consider what the result would be where receipt of written notice was preceded by oral notice. It also follows that when a Bankruptcy Court grants an administrative lien or claim in lieu of granting reclamation, the claim or lien should be measured by the invoice amount of the amount of goods on hand when the debtor received notice. Compare *In re Flagstaff, supra*, 14 B.R. 462.

In sum, a commercially reasonable demand for reclamation is effective upon dispatch by the seller. However, the amount of goods to be reclaimed is measured when the debtor receives notice of the demand.

B.R. 670 (Bankr.E.D.Mich.1981); *In re Original Auto Parts Distributors, Inc.,* 9 B.R. 469 (Bankr.S.D.N.Y.1981). The courts have read a negative implication into Code § 546(c), namely that a UCC § 2–702 reclaiming seller who does not fit into Code § 546(c) is intended by Congress to be subordinate to the trustee under Bankruptcy Code § 544 *et seq.* *See* White, Summers, Uniform Commercial Code § 24–9 (2d ed. 1980). Since Section 2–702 of the Uniform Commercial Code was designed to codify the seller's common law right to reclamation on the grounds of fraud,[8] it would follow that "a seller who is unable to utilize Section 2–702(2) for [procedural reasons] will also usually be unable to employ Section 546(c) in which case the availability of common law fraud remedies will be of little avail also, because they too depend upon these requirements under section 546(c)." Mann and Phillips, Section 546(c) of the Bankruptcy Reform Act: An Imperfect Resolution of the Conflict Between the Reclaiming Seller and the Bankruptcy Trustee, 54 Am.Bankr.L.J. 239 at 261 n. 107 (1980). But see *Id.* at 267 (Section 546(c) provides the seller with a "safe harbor" against the trustee or debtor, but it is not the exclusive remedy). "In sum, the substantial weight of authority holds that section 546(c) represents an exclusive remedy, and unless a seller meets the ten-day notice requirement, it has no other common law or statutory right of action." *In re HRT Industries, Inc.,* 29 B.R. 861, 864 (Bankr.S.D.N.Y.1983).

Allstate's claim to the proceeds of the sale of the equipment is subordinate to the rights of GECC as the holder of a security interest in the accounts receivable. The Uniform Commercial Code provides that the rights of the secured party to an account receivable are superior to those of a seller who does not retain a purchase money security interest. See UCC §§ 9–107, 9–301 and 9–306. See also *In re Samuels & Co., Inc. (Stowers, et a. v. Mahon, et al.),* 526 F.2d 1238 (5th Cir.1976). Even if these general principles were not sufficient, the Second Circuit's decisions known as (Flagstaff I) and (Flagstaff II), cited *supra,* would dictate this outcome.

CONCLUSION

Thus, this court concludes that Allstate's demand for reclamation fails due to the finding of fact that, although proper and timely demand was made and insolvency existed, the goods sought to be reclaimed were not in Flagstaff's possession at the time of demand. Allstate's allegation of fraud also fails. This court is of the opinion that Code § 546(c) is the exclusive remedy for reclaiming creditors. In any event, the rights of GECC as a secured party are superior to Allstate's by virtue of the Uniform Commercial Code and the terms of the July 29 financing order. Since Allstate's first two allegations fail, so must its third which sought reimbursement for attorneys' fees. Accordingly, Allstate's complaint is dismissed as to all parties.

It is so ordered.

---

**8.** Subsection (2) of § 2–702 provides:

"Where the seller discovers that the buyer has received goods on credit while insolvent he may reclaim the goods upon demand made within ten days after the receipt, but if misrepresentation of solvency has been made to the particular seller in writing within three months before delivery the ten-day limitation does not apply. Except as provided in this subsection the seller may not base a right to reclaim goods on the buyer's fraudulent or innocent misrepresentation of solvency or of intent to pay."

This subsection takes as its base line the proposition that any receipt of goods on credit by an insolvent buyer amounts to a tacit business misrepresentation of solvency and therefore is fraudulent as against the particular seller. McKinney's Consolidated Laws of New York Annotated, Uniform Commercial Code § 2–702 Official Comment (1964). This section also expressly provides that § 2–702 is an exclusive remedy.